658 So.2d 961 (1995)
In re the ADOPTION OF BABY E.A.W.
G.W.B., Petitioner,
v.
J.S.W., et ux., et al., Respondents.
No. 84819.
Supreme Court of Florida.
July 20, 1995.
*963 Steven Pesso, Boca Raton, for petitioner.
Stuart R. Manoff of Weissman & Manoff, P.A., West Palm Beach; and Michele I. Nelson of Paxton, Crow, Bragg, Smith & Keyser, P.A., West Palm Beach, for respondents.
Suellyn Scarnecchia, Child Advocacy Law Clinic, University of Mich. Law School, Ann Arbor, MI, amicus curiae, for DeBoer Committee for Children's Rights.
Lynn G. Waxman, West Palm Beach, amicus curiae, for Charlotte Danciu.
HARDING, Justice.
We have for review In re Adoption of Baby E.A.W., 647 So.2d 918 (Fla. 4th DCA 1994), where the district court certified this question as one of great public importance:
IN MAKING A DETERMINATION OF ABANDONMENT AS DEFINED BY SECTION 63.032(14), FLORIDA STATUTES (SUPP. 1992), MAY A TRIAL COURT PROPERLY CONSIDER LACK OF EMOTIONAL SUPPORT AND/OR EMOTIONAL ABUSE OF THE FATHER TOWARD THE MOTHER DURING PREGNANCY AS A FACTOR IN EVALUATING THE "CONDUCT OF THE FATHER TOWARDS THE CHILD DURING THE PREGNANCY."
We have jurisdiction based on article V, section 3(b)(4) of the Florida Constitution.
G.W.B. is the birth father of Baby E.A.W., a child born out of wedlock in 1992 and placed with adoptive parents shortly after her birth. This case concerns whether G.W.B. abandoned the child and, ultimately, whether she was available for adoption. Without abandonment, G.W.B.'s consent was required for Baby E.A.W.'s adoption. See § 63.072(1), Fla. Stat. (1991).
The trial court initially found no abandonment, but reversed its decision on rehearing. On appeal, a three-judge panel of the Fourth District Court of Appeal voted two to one that G.W.B. did not abandon Baby E.A.W. On rehearing en banc, the court found abandonment by a vote of six to five. E.A.W., 647 So.2d 918.
As a preliminary matter we note that the certified question misquotes the applicable statute. Section 63.032(14), Florida Statutes (Supp. 1992), allows a court to consider the father's conduct toward the child's mother  not toward the child, as the certified question says  during the pregnancy.[1] We thus decide *964 whether section 63.032(14) allows a trial court to consider lack of emotional support and/or emotional abuse in evaluating the conduct of the father toward the child's mother during pregnancy.
We answer the reframed certified question in the affirmative because we find that the legislature's use of the word "conduct" in section 63.032(14) encompasses a father's lack of emotional support and/or emotional abuse toward the mother during her pregnancy.
G.W.B. raises two other issues. We have jurisdiction over these issues because of our jurisdiction to review the district court's decision based on the certified question. Feller v. State, 637 So.2d 911, 914 (Fla. 1994). First, we find no merit to G.W.B.'s argument that the trial court was unduly prejudiced by best-interests evidence because the final order on rehearing clearly indicates that the judge did not consider this evidence. Second, while we do not reweigh the evidence taken by the trial court, we find the evidence supports the trial court's determination that there was clear and convincing evidence that G.W.B. abandoned Baby E.A.W.

I. FACTS
The facts in this case are based on the trial court's detailed findings in its Order on Rehearing of Abandonment Issue, which is attached as an appendix to this opinion.
G.W.B. and the birth mother had lived together for some months when she became pregnant in November 1991.
The birth mother's testimony was that G.W.B. had very little reaction when she told him during Christmas 1991 that she was pregnant. She was employed and paid her own expenses during December 1991 and part of January 1992, but could not work after an accident in January 1992. From that point on, she was lonely and received little financial support from G.W.B. She bought food with food stamps and gave a government aid check to G.W.B. for her expenses.
The birth mother's doctor testified that the birth mother was emotional and having trouble at home during this time. G.W.B. did not accompany the birth mother to any of the doctor visits. The birth mother testified that G.W.B. did accompany her on one visit, but that he was an "ice cube."
The birth mother gave further testimony that she received little, if any, emotional support from G.W.B. from February through June 1992. G.W.B. once grabbed her, shook her, and spit at her because she used his razor. He called her names and verbally abused her. In addition, G.W.B. had a drinking problem.
The birth mother moved out of G.W.B.'s home in June 1992. Sometime before this, she told G.W.B. that she was considering adoption. He told her to "do whatever you have to do." Based on this response, she followed through with the adoption process.
From the time the birth mother moved out until Baby E.A.W. was born, the birth mother received neither financial nor emotional support from G.W.B. The only phone calls she received from G.W.B. came early in the morning and apparently were made to annoy her.
G.W.B.'s testimony was that he earned $300 to $400 a week during this time and that he effectively paid for food and shelter for the birth mother and her son from another relationship. He was overjoyed about becoming a father. During the pregnancy, he bought one pair of stretch pants for the birth mother and, using money from his mother, bought a crib. He spoke with the birth mother several times after she moved out.
G.W.B. testified further that Charlotte Danciu, an attorney-intermediary in the adoption proceedings, contacted him in July *965 1992. He told Danciu that he would not give up the child for adoption and then sought legal representation.
After reciting its findings of fact, the trial court found clear and convincing evidence that G.W.B. financially and/or emotionally abandoned the birth mother during her pregnancy. The judge found that even if he accepted G.W.B.'s testimony that he paid for more than half of the couple's expenses, "there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement his earnings." The judge found that the birth mother was on her own emotionally during the pregnancy. G.W.B. even resumed a sexual relationship with a former girlfriend while the birth mother was pregnant.
In addition, the trial court found almost no testimony to establish that G.W.B. exhibited any feeling for the unborn child. It appeared, in fact, that if Danciu had not contacted him, he would have continued his passive stance. Notified that the birth mother planned to put the baby up for adoption, he sought counsel. The trial court noted, "More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally."
In determining that G.W.B. did not provide emotional or financial support to the birth mother, the trial court concluded in its September 1993 order:
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned (Florida Statute 63.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
A three-judge panel of the Fourth District Court of Appeal reversed the trial court's finding of abandonment. Baby E.A.W., 647 So.2d at 941 (appendix reprinting the district court's panel decision). The court found the evidence in conflict, but determined that G.W.B. supported the birth mother while he lived with her and objected to the adoption before the birth of Baby E.A.W. Id. at 948. The court also concluded that emotional support could not be used to determine abandonment. Id. at 949.
After rehearing en banc, the district court reversed the panel decision and found that G.W.B. abandoned Baby E.A.W. both financially and emotionally. Id. at 924. Recognizing the uncertainty over whether a trial court may consider emotional support in making its decision on abandonment, the district court certified the question to this Court. Id.

II. THE CERTIFIED QUESTION
We conclude that a trial court, in making a determination of abandonment, may consider the lack of emotional support and/or emotional abuse by the father of the mother during her pregnancy. G.W.B. conceded this point during oral argument, but our resolution of the certified question is not based on this concession. Our decision is based on caselaw and statutory language.
This Court first recognized in In re Adoption of Doe, 543 So.2d 741, 747 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), that evidence of a parent's prebirth conduct is relevant to whether a parent has abandoned a child. Doe concerned an unmarried father who was financially able to  but did not  support his child prenatally. The Court found that, by his behavior, he waived his right to consent to the adoption of the child. Id. at 749. Although Doe primarily concerned the father's ability to provide financial support to the mother, the Court also noted:
A finding of abandonment under chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent's legal custody or relationship with the child.
Id. at 744 (emphasis added).
When this Court decided Doe, chapter 63 did not include a definition of abandonment. The Court looked to section 39.01(1), Florida Statutes (1985), which defined abandonment *966 in juvenile proceedings. The definition in chapter 39 did not discuss a father's prebirth conduct, but the Doe Court nonetheless decided that such conduct is relevant because it "does tend to prove or disprove material facts bearing on abandonment." Id. at 746.
After Doe, the Legislature amended section 63.032 to define abandonment. The definition tracks the one in section 39.01(1) (juvenile proceedings), but adds a sentence that is critical to the instant case: "In making this decision [of abandonment], the court may consider the conduct of a father toward the child's mother during her pregnancy." § 63.032(14), Fla. Stat. (Supp. 1992) (emphasis added).
We find that by this language the Legislature clearly did not limit "conduct" to financial support. Conduct generally connotes behavior. Baby E.A.W., 647 So.2d at 927 (Pariente, J., concurring specially); see also id. at 924 (majority opinion) (statute encompasses "entire spectrum of `conduct'"). Dictionary definitions of "conduct" include the act, manner, or process of carrying out a task and a mode or standard of personal behavior. Webster's Third New International Dictionary 473-74 (1961).
Because we find the statute clear and unambiguous, we need not resort to rules of statutory interpretation and construction. See Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984). Thus, we conclude that the Legislature's use of the general term "conduct" in section 63.032(14) allows a court to consider prebirth conduct such as emotional support and/or abuse by the father of the mother during pregnancy.
While conceding that section 63.032(14) allows a court to consider emotional support in making its determination of abandonment, G.W.B. urges this Court to quantify how much weight a court may give to a father's lack of emotional support during the mother's pregnancy. We are not in a position to assign weight in this manner. The determination of abandonment is fact-specific and, absent direction from the Legislature, we cannot dictate to trial courts precisely how to evaluate the factors that go into making this decision.

III. BEST-INTERESTS EVIDENCE
While conducting the rehearing on abandonment, the trial judge heard evidence that went to the best interests of Baby E.A.W. We agree with G.W.B. that best-interests evidence was not relevant unless Baby E.A.W. was available for adoption and that she was not available for adoption without a finding that she had been abandoned. But it is obvious that in this case the trial judge did not base his decision on best-interests evidence.
His order says:
[B]ecause the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which were raised to the introduction of certain exhibits and/or testimony would become moot.
(Emphasis added.) The detailed, nine-page order on rehearing specifically indicates that the trial court based its decision on G.W.B.'s behavior toward the birth mother and thus refutes G.W.B.'s argument that the trial judge was unduly prejudiced by the best-interests evidence. We commend the trial judge for making clear in his order that he did not consider best-interests evidence in reaching his decision on abandonment.

IV. ABANDONMENT
The United States Supreme Court has held that natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982).
The liberty interest is not absolute, however. The Court has distinguished between married and unwed fathers, noting that "the mere existence of a biological link does not merit equivalent constitutional protection." Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983). The substantial due process protection attaches only when an unwed father demonstrates a full commitment to the responsibilities *967 of parenthood by coming forward to participate in raising his child. Id.
We recognize the sanctity of the biological connection, and we look carefully at anything that would sever the biological parent-child link. To terminate a parent's right in a natural child, the evidence must be clear and convincing. Santosky, 455 U.S. at 747-48, 102 S.Ct. at 1391-92; see also In re R.W., 495 So.2d 133, 135 (Fla. 1986) (requiring clear and convincing evidence before terminating parental rights because of abandonment).
This Court has defined clear and convincing evidence as an
intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
In re Davey, 645 So.2d 398, 404 (Fla. 1994). The trial judge is responsible for finding facts and for resolving any conflicts in the evidence. Florida Bar v. Hooper, 509 So.2d 289, 290-91 (Fla. 1987). As we said in Davey, the evidence must be sufficient to convince the trier of fact without hesitancy. 645 So.2d at 404.
In his thoughtful dissent below, Judge Klein, among other things, questioned how the trial judge could initially find no abandonment, then determine after rehearing that abandonment had been established by clear and convincing evidence. Baby E.A.W., 647 So.2d at 934 (Klein, J., dissenting). We note that the trial judge received additional evidence on rehearing. In addition, our task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute our judgment for that of the trier of fact. Instead, we will uphold the trial court's finding "[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court's judgment in favor of terminating ... parental rights." Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993), review denied, 634 So.2d 625 (Fla. 1994).
Our review of the record shows substantial competent evidence to support the trial judge's finding of clear and convincing evidence that G.W.B. abandoned Baby E.A.W. The evidence in the record reveals that G.W.B. showed little to no interest in the birth mother or the unborn child. Once the birth mother moved out of the home, he provided no financial or emotional support. As the trial court noted, the evidence suggests that G.W.B. might have continued his passive stance toward the birth mother and the child had Danciu not contacted him about adoption. Even then, the record shows that G.W.B. still did not make any move to provide financial or emotional support to the birth mother or the unborn child. We therefore approve the district court's decision affirming the trial court's finding of abandonment.

V. CONCLUSION
Accordingly, we answer the reframed certified question in the affirmative and approve the decision in Baby E.A.W. finding that G.W.B. abandoned Baby E.A.W. Thus, G.W.B.'s consent was not required before Baby E.A.W. could be placed for adoption.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW and WELLS, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., dissents with an opinion.

APPENDIX
IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR PALM BEACH COUNTY

CASE NUMBER: CD-92-5616-FY

In re: the Matter of the Adoption of a minor child.

ORDER ON REHEARING OF ABANDONMENT ISSUE
THIS CAUSE came before the Court upon the application of the prospective adoptive *968 parents for the entry of an order which would rehear this Court's previous Order Denying Motion to Waive Birth Father's Consent.
The Order Denying the Motion to Waive the Birth Father's Consent is docket entry 28 and the Motion for Rehearing is docket entry 30.
At the initial evidentiary hearing conducted on October 9, 1992, the Court made findings that the natural father had not abandoned the natural mother during the prenatal period and, as such, the natural father's consent to the adoption had to be obtained.
Subsequent to that hearing, this Court appointed counsel to represent the infant and the prospective adoptive parents also hired additional counsel to assert their continued application for custody and adoption.
This Court initially took testimony on February 11, 1993. At that time, the natural mother testified as well as a former fiancee of the natural father, a physician offered testimony as to the emotional condition of the natural mother during the pregnancy and two friends and former neighbors of the natural mother and natural father offered testimony as to the conditions that the natural mother lived in with the natural father during the pregnancy. The natural father's brother also offered brief testimony at the initial hearing.
This cause was rescheduled for a continuation of the testimony, but was continued upon the agreement of all of the parties. For whatever reason the continuance may have been asked for, the cause was ultimately rescheduled for additional testimony which occurred on August 3, 1993. At that time, the natural father offered testimony, a psychiatrist offered testimony, two friends of the parties offered testimony and a mental health counselor for the natural father offered testimony.
The parties' final argument and legal memorandums were submitted to the Court in writing and the last of those was received by this Court on August 24, 1993. Based upon all of the testimony, upon this Court's review of the argument of counsel and the Court being otherwise fully advised in the premises, it is the finding of the Court as follows:
1. The natural mother ... and the natural father had been living together for a period of some months when the natural mother became pregnant in November of 1991.
The Court finds that her testimony is unrefuted that she told the natural father of the pregnancy during the Christmas period of 1991. Her testimony at that time was that he had very little reaction to the fact that she was pregnant.
2. During December of 1991 and January of 1992, the natural mother was employed and was basically paying her own way. Her testimony was that she received neither financial or emotional support from the natural father during this period of time.
3. She was involved in an accident in January of 1992 and subsequent to that she was not able to work.
4. The natural mother testified [sic] was that from that point forward she was a lonely and lost person. She received little, if any, financial support from the natural father and she survived on food which was purchased with food stamps and gave her Aid to Dependent Children check to the natural father which basically covered her share of the rent on the unit they lived in. This testimony was substantiated by the testimony of Dr. Parkovich, the natural mother's physician, who testified to the fact that the natural mother looked terrible during this period of time, that their meetings were tearful and emotional and that the natural mother was an emotional wreck and was having substantial problems at home with the natural father. The doctor further testified that the natural mother was not eating properly. Dr. Parkovich testified to substantial money problems and that the natural mother could not believe that the natural father was having an affair during this trying period in her life. Dr. Parkovich also testified that the natural father never came to any of the doctor visits, never drove the natural mother to these visits and it was only because of the natural *969 mother's friends that she was able to attend her visits with her physician.
5. On February 13, 1993, [sic] the natural father signed a paper which "required" the natural mother to pay one-half of (in other words, her own) the expenses for rent, electric, water and telephone. Further, the document required her to purchase her own food. ([S]ee Petitioner's Exhibit Number One from the hearing on October 9, 1992[.])
6. From February until June of 1992, the parties remained together and the testimony of the natural mother, collaborated by the testimony of her physician, and her neighbor, was that the financial situation between the parties did not change. In other words, the natural mother was, in effect, paying her own way.
7. During this period of time, February to June, 1992, the natural mother's testimony was that there was minimal, if any, emotional support from the natural father. At one point in time, her testimony indicated that there was physical abuse, that he had grabbed her, shook her and had spit at her because she had the audacity to use his razor. The natural mother's testimony was specific that [G.W.B.] not only did not supply her with any emotional comfort during this time, but, to the contrary, engaged in name calling and other types of verbal abuse. For example, he told her that she was "worthless" and that every other week she would be threatened with being kicked out of the apartment. The natural mother testified that she was continually fearful of the natural father. Additionally, the natural mother testified that the natural father had a drinking problem which went on continuously during the time the parties spent together.
The natural mother moved out of the natural father's apartment in June of 1992. Sometime prior to this time, the natural mother testified that she told the natural father she was considering adoption and the natural father's response was "do whatever you have to do."
The natural mother accepted this statement from the natural father as his verbal agreement with her adoption intention. As a result of that, the natural mother continued to follow through with the adoption process. The testimony was specific that at no time from February of 1992 until literally days before the birth of the child, did the natural father in any way either act directly, or by inference, to show any objection to the potential adoption of the unborn child.
Additionally, the testimony of the natural mother revealed that the natural father attended only one visit with any health care provider during the entire course of the pregnancy. While he was there, he was an "ice cube" and showed no emotion of any kind either toward the unborn child or the natural mother herself.
8. From the time the natural mother moved from the apartment through July of 1992, she lived with her girlfriend. The testimony of both the natural mother and the girlfriend was that the natural father provided zero financial support during this time and to the best of the girlfriend's recollection there was one telephone call from him to the natural mother during this period of approximately one and a half months.
9. During the period of June, July, and August, when the natural parents were living separate and apart, the natural mother's testimony was that she received neither financial or emotional support from the natural father. The only telephone calls he made to her were at 2:00 or 3:00 o'clock in the morning and were basically made to aggravate her.
10. The natural father's testimony was received initially in a hearing conducted by the Court on October 9, 1992.
The natural father's testimony at that time was that he was earning in the approximate amount of $300.00 to $400.00 a week, net, and that he was, in effect, financing all of the food and shelter for the natural mother and her food stamps were basically being used for her son who was also living with them.
11. Contrary to the natural mother's testimony, the natural father testified that he was "over joyed" with the fact that he was going to be a father.
12. During the entire course of the pregnancy, the natural father's testimony was *970 that he bought the natural mother one pair of stretch pants which the natural mother denied ever receiving.
13. The natural father testified that he bought a crib for $40.00, but the money actually came from his mother and was not money out of the natural father's pocket.
14. The natural father testified that he was contacted by Attorney Charlotte Danciu in July of 1992 and at that point he was emphatic that he was not going to give up the child for adoption and that he began his quest for legal representation at that time.
15. Additionally, the natural father's testimony was that he did speak with the natural mother on a number of occasions during the month of July and August which statements were denied by the natural mother. This testimony is inconclusive at best, but the more believable testimony, based on the preceding months of these parties' lives, would be that the natural father had very nominal contact with her.
16. The test that the Court needs to follow is whether the testimony presented by the various witnesses establishes by clear and convincing evidence that the natural father did, in fact, financially and/or emotionally abandon the natural mother during the course of the pregnancy. The Court finds that abandonment did occur and, therefore, the Court grants the Petition for Rehearing and by the terms of this order will set aside the previous finding of lack of abandonment.
Specifically, the Court finds that the natural parents' relationship was at best a love-hate situation in its initial stages and deteriorated to the hate side of the scale after the pregnancy and the natural mother's accident. Specifically, even if the Court accepts the natural father's testimony that he was supplying in excess of one-half of the finances of the natural parents, there can be no doubt that he was living off of her food stamps and demanding her Aid to Dependent Children check to supplement the money that he was bringing in as a painter. Emotionally, the testimony is unrefuted that [the birth mother] was on her own as far as this pregnancy was concerned. The natural father went so far as to resume a sexual relationship with his former girlfriend at the same time that his pregnant girlfriend was suffering from the injuries she received in the accident.
The Court specifically finds that the natural father offered minimal financial support to the natural mother and that the emotional support to the mother was nonexistent. More importantly, there was almost no testimony to establish that the natural father exhibited any type of feeling for the unborn child. In fact, it appears that if the prospective adoptive parents' lawyer had not contacted him, he would have continued his passive stance of allowing the natural mother to "do what you have to do." It was only when he was requested to put in writing his acquiescence to the adoption that he changed his position and attempted to assert a legal right. It is interesting to note that he did not rush to the mother's side, offer her any financial assistance, or attempt to become a "prospective father." What he did was rush to the Legal Aid Society of both Broward and Palm Beach Counties in an effort to get a free lawyer to start fighting for some supposed legal right that he had. If this was the man who was earning $300.00 to $400.00 a week net which he claimed he was making and using the money to support the natural mother, how could he possibly have qualified for the advice of the Legal Aid Society. More importantly, it is a simple fact that during the time he was seeking a lawyer, he was still completely out of contact with the natural mother and the unborn infant, both financially and emotionally. Other than attempting to assert his legal rights, that sad fact has never changed.
This Court realizes that the previous order denying the request for abandonment was very emphatic in its statement that the natural father had not abandoned the unborn child. However, upon the testimony presented during the application for rehearing, as well as upon the law as was set forth in the well reasoned briefs of ... ALL of the parties, the Court finds that it, in fact, must reverse its previous decision and find that the natural father did abandon this unborn child. The most important testimony that this Court feels establishes that fact is the *971 previously set forth facts of what the natural father did when the adoption application became a reality to him. It is inconceivable to this Court that the natural father would not have made some effort, ANY minimal effort, to contact the natural mother and attempt to work out any kind of an arrangement other than the adoption that she was proceeding with. He just did not do anything other than to run to the State of Florida to attempt to get a free lawyer. He showed not only a callous disregard for the natural mother, he also exhibited a complete lack of understanding or feeling toward the unborn child and the resulting chaos it would cause in the life of the infant after her birth and potential placement with the birth [sic] parents.
The finding of abandonment as it applies to the birth father is a very harsh remedy. However, to quote the landmark case of ADOPTION OF DOE V. ROE [sic], 543 So.2d 741 at page 744,
"The child's well-being is the raison d'etre for determining whether a child has been abandoned by a parent or parents. A finding of abandonment under chapter 63 means, for whatever reason, the parent or parents have not provided the child with emotional and financial sustenance and, consequently, the well-being of the child requires severing the parent's legal custody or relationship with the child. Abandonment under chapter 63 is not a criminal prosecution for the purposes of punishing parents, it is a civil proceeding intended to serve the best interests of the child."
Based upon the guidance as supplied by the Supreme Court from the above quotation, the mandates of Florida Statute 63, the finding of facts presented to the Court in the various hearings conducted herein and the Court being otherwise fully advised in the premises, it is
ORDERED AND ADJUDGED that the evidence is clear and convincing that the natural father did not exhibit sufficient financial or emotional support to the natural mother during the course of the pregnancy to sustain the position that he did not "abandon" either the natural mother or the unborn child. As a result of that abandonment, the Court finds, and, so orders, that it is not necessary for the prospective adoptive parents to secure the consent of the natural father for their continued effort to adopt the minor child.
Additionally, because the Court has found that the natural father abandoned the minor child, it is unnecessary for this Court to delve into the question of the best interest of the child and, therefore, the Court finds that the various objections which where [sic] raised to the introduction of certain exhibits and/or testimony would become moot.
The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned (Florida Statute 63.032(14)). Therefore, the prospective adoptive parents are directed to apply to this Court for an appropriate ex parte hearing on the question of the finalization of the adoption.
DONE AND ORDERED in ... Palm Beach County, Florida, on this 14th day of September, 1993.
 /s/
 Circuit Judge
KOGAN, Justice, concurring in part, dissenting in part.
I must begin by noting that this case involves a putative father not married to the biological mother, a major distinguishing fact. Florida law presumes that a man married to the biological mother is in fact the legal father of the child, based in part on the child's interest in legitimacy. Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla. 1993). A corresponding enforceable duty arises for the legal father to support the child. But unwed fathers enjoy no such presumption and owe no automatic duty of support to the child.[2] In a real sense, the unwed father's interest with respect to the child is less certain than that of the legally recognized father. It is this uncertainty that is the focus of this case; and the difficult nature of this uncertainty cannot *972 be understood apart from its historical development.
Until quite recently unwed fathers were regarded as having few if any rights with respect to their offspring. That situation did not substantially change until the United States Supreme Court issued its 1972 opinion in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). See Robin Durocher, Balancing Competing Interests in Post-Placement Adoption Custody Disputes: How Do the Scales of Justice Weigh the Rights of Biological Parents, Adoptive Parents, and Children?, 15 J.Legal.Med. 305 (1994); Lynn Kirsch, Unwed Fathers and Their Newborn Children Placed for Adoption: Protecting the Rights of Both in Custody Disputes, 36 Ariz.L.Rev. 1011, 1013 (1994). The Stanley opinion revolutionized the law in this area by recognizing a due process right biological fathers possess with respect to their offspring, though the extent of this right has remained clouded with doubt to the present day.
Indeed, American law on this question is most notable today for its confusing nature. It is clear that the law now at least gives the unwed father a chance to be heard prior to the adoption, but beyond that, little is certain. In broad terms the national controversy now involves two competing approaches, along with variations of them. These are: (1) the "biological rights" standard, which places heavy emphasis on the rights of genetic parents; and (2) the "best interests" standard, which tends to favor the "psychological parent"  the adult who has created a stable home environment and whom the child thus has psychologically come to view as its parent. Kirsten Korn, The Struggle for the Child: Preserving the Family in Adoption Disputes Between Biological Parents and Third Parties, 72 N.C.L.Rev. 1279, 1316-20 (1994). These two standards each have strong and weak points and can be applied in varying ways, but each is generally exemplified in two similar and highly publicized cases.
The first case involved a child popularly known as "Baby Jessica," who had been put up for adoption by her natural mother shortly after her birth on February 8, 1991. The mother initially had listed another man as the natural father, but nine days after the adoption petition was filed she had a change of heart and identified the actual biological father. The latter promptly challenged the adoption. After months of legal complications, the Iowa Supreme Court ultimately held that the biological father's rights had not been terminated and that Baby Jessica thus was not available for adoption. The Iowa Court in particular noted that it could not apply a "best interests" standard, even though Jessica's interests might best be served by remaining with the only family she had known for the first years of life  her potential adoptive parents. In re B.G.C., 496 N.W.2d 239 (Iowa 1993).
The best-interests standard was exemplified by an Illinois appeals court case involving a child widely known as "Baby Richard." The mother in this case had refused to disclose the identity of the biological father, apparently out of concern he might veto the placement. When the father learned of the child's existence, he quickly challenged the adoption. The intermediate appellate court focused extensively on a "best interests" standard in determining that the child was the real party in interest and that his interests demanded he stay with the only parents he had known  his adoptive "psychological parents." In re Petition of Doe, 254 Ill. App.3d 405, 194 Ill.Dec. 311, 627 N.E.2d 648 (1993). The Illinois Supreme Court, however, reversed after applying the "biological rights" standard used in Iowa. In re Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994). Baby Richard thus was placed with his biological father after spending roughly the first three years of life with another family.
It is well worth noting at this point that the United States Supreme Court has denied appellate review in both the Baby Jessica[3] and Baby Richard cases,[4] thereby leaving *973 intact court orders returning these children to their biological parents.
One of the more recent pronouncements on this topic is the 1994 revision of the Uniform Adoption Act ("UAA") promulgated by the highly respected National Conference of Commissioners on Uniform State Laws. The UAA has combined the two standards in an interesting way: Upon challenge to the adoption of a child less than six months of age,[5] petitioners must establish (1) by clear and convincing evidence a ground constituting abandonment (which may include evidence of prenatal abandonment) or, alternatively, that the father has been convicted of certain crimes,[6] or is not the legal, adoptive, or genetic father of the child, and (2) by a preponderance of the evidence that termination is in the best interests of the child. Once this is done, the burden then shifts to respondent to rebut, including proving by a preponderance of the evidence a compelling explanation why any abandonment occurred (such as poverty, deception by the mother, and so forth). If the respondent presents such proof, the burden then shifts back to the potential adoptive parents to establish one of four factors that would weigh in favor of terminating parental rights, including further consideration of the child's best interests. Unif.Adoption Act, § 3-504 (1994).
The UAA includes the following commentary:
[A] respondent father's rights may be terminated on the basis of his behavior prior to the minor adoptee's birth, including a failure to manifest an ability or willingness to assume parental duties, unless he can prove a "compelling reason" for his failure. State courts have found it constitutionally permissible to terminate a father's status for pre-birth "abandonment" of an unwed mother whom the father knew was pregnant.
9 U.L.A. 5, 55 (1995 Supp). As authority, the UAA cites our opinion In re Adoption of Doe, 543 So.2d 741 (Fla. 1989). In this sense, the UAA language may only be as solid as our earlier opinion: The United States Supreme Court still might reject this view in a future case.
While the UAA obviously has not been adopted in Florida, it nevertheless represents a considered view by noted scholars. And its attempt to combine the two competing standards into a single analysis suggests a very important point: that both may actually have some relevance to these cases.
This last conclusion also finds support in opinions of the United States Supreme Court. In 1983, for example, the Court found that unwed putative fathers possess only what may be called an "opportunity interest" in establishing legal fatherhood. Like the UAA, the Court used an analysis suggesting that the best interests of the child may factor into the equation whenever an adoption is challenged, although the emphasis here is somewhat different:
"[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in `promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233, 92 S.Ct. 1526, 1541-1542, 32 L.Ed.2d 15 (1972)).
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make *974 uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
Lehr v. Robertson, 463 U.S. 248, 261-62, 103 S.Ct. 2985, 2993-94, 77 L.Ed.2d 614 (1983) (emphasis added) (footnotes omitted).
These statements are important, first, because they indicate that the unwed putative father has merely an inchoate right to establish legal fatherhood, which he may exercise or neglect as he sees fit.[7] Second, they suggest that the father's "opportunity interest" matures into a due process right if he "accepts some measure of responsibility for the child's future." Third, the quoted material also indicates that the "child's best interests" are to some degree relevant.[8] This is so, the Court indicated, because society's interest in the establishment and support of a stable home environment for the child deserves consideration along with the interests of blood kinship. The Lehr Court regrettably was silent as to how we should balance "best interests" against kinship rights when the two are in irreconcilable conflict, as they are here.
One clue as to the Court's thought on this last matter was provided in an opinion issued by Justice Stevens in his capacity as Circuit Justice reviewing a stay petition in the Baby Jessica case. DeBoer v. DeBoer, ___ U.S. ___, 114 S.Ct. 1, 125 L.Ed.2d 755 (1993). This opinion is of uncertain precedential value because of its peculiar status as the solitary view of Justice Stevens. Nevertheless, I think we cannot ignore the fact that the full Court has not disputed Justice Stevens' analysis.
In DeBoer, Justice Stevens denied a stay application from the potential adoptive parents of Baby Jessica, who by then had been ordered to return the child to her natural parent. In rejecting that petition, Justice Stevens made the following pertinent remarks:
Neither Iowa law, Michigan law, nor federal law authorizes unrelated persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education. As the Iowa Supreme Court stated: "[C]ourts are not free to take children from parents simply by deciding another home appears more advantageous." In re B.G.C., 496 N.W.2d 239, 241 (1992) (internal quotation marks and citation omitted).
Id. at ___, 114 S.Ct. at 2. The present case obviously can be distinguished because the trial court below found a prenatal abandonment. Yet I cannot ignore the clear implication of Justice Stevens' opinion: that the rights of biological parents cannot be ended lightly, and especially not because of factors that reflect more on socioeconomic status than fitness to parent.
While the relevant law plainly is unsettled, the discussion above reveals enough to leave me with considerable doubt about the majority opinion. By the same token I am not convinced that the fairly complex best-interests analysis used by the UAA entirely squares with what the United States Supreme Court has told us about these cases.[9] Justice Stevens' remarks in DeBoer  which can be harmonized with cases announced by the full Court  imply that great weight must be given to the biological father's opportunity interest, at least on facts similar to those in the Baby Jessica case. I take this to mean *975 that the best interests of the child will seldom defeat a timely and legally sufficient challenge by the biological father made before or shortly after the child's birth, as happened with Baby Jessica.
Nevertheless, Lehr teaches that the child's best interests at least sometimes will be relevant. And I think that psychological and legal concerns as well as simple fairness compel this same conclusion. In Privette, for example, we ourselves noted an overriding policy concern in a similar context:
It is conceivable that a man who has established a loving, caring relationship of some years' duration with his legal child later will prove not to be the biological father. Where this is so, it seldom will be in the children's best interests to wrench them away from their legal fathers and judicially declare that they now must regard strangers as their fathers. The law does not require such cruelty toward children.
Privette, 617 So.2d at 309. While Privette is distinguishable because the father there had legally recognized parental rights, it nevertheless indicates a major point: The passage of time factors into this equation in an important way. Biological parents, in other words, must assert their rights early in the child's life.
The most reasonable interpretation of the various cases described above is that the child's best interests become more relevant as the period of time increases between the child's birth and the date the biological father's legal challenge is filed. And this in turn implies that there is an early period during which the child's best interests are less relevant absent some unusual factor. This period precisely corresponds with the time during which the biological father must act upon his opportunity interest or forever lose it. In other words, challenges made very early in the child's life will be gauged more by the "biological rights" standard, but the standard then will shift toward a "best interests" analysis as time passes. As we said in In re Adoption of Doe, 543 So.2d 741, 744 (Fla. 1989):
[T]here may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment.
I agree wholeheartedly that bonding is relevant. In light of Doe, I do not find the majority opinion inconsistent with the general analysis I am outlining here; and to that extent I concur with the majority.
In the interest of more certain application, I think it reasonable to fix a point in time at which the child's best interests first become relevant in the normal case. The six-month postnatal period suggested by the UAA is reasonable and not inconsistent with the Florida statute, and I therefore would adopt it as the demarkation point. Thus, for challenges made by a biological father less than six months after birth, the best interests of the child will have only minimal if any relevance. For challenges made more than six months after birth, I believe the best interests of the child would then become a relevant factor, weighing more heavily with the trial court as the child bonds with its adoptive family. A point would soon be reached where the child's interest in remaining with its "psychological parents" would become so compelling as to wholly defeat any countervailing interest the biological father has.
This approach has a number of benefits that better harmonize the relevant authority both with itself and with what we know of child psychology. In the law it is axiomatic that one who sits on his rights forfeits them, and this is no less true of biological fathers with respect to their offspring. A biological father who does not assert his opportunity interest soon after birth simply cannot be equated with one who does. The Fourteenth Amendment's due process clause provides many protections, but these do not include a "second chance" to invoke a lapsed right.
Likewise, a six-month demarkation point would better minimize the risk of psychological harm to the child. During the first six months of life the child is less cognitively aware, but after six months the child's ability to intelligently perceive and emotionally *976 react to its surroundings and caretakers grows rapidly. As the child becomes older it soon identifies its caretakers as parents, bonding with them. As this bonding increases, a psychological family soon comes into being.[10] Of course, expert testimony on this point would be admissible evidence; and the child's best interests should weigh more heavily to the degree it has psychologically bonded with its caretakers.
Yet another legal problem must be addressed, and it is one that I think reflects unfavorably on the way the courts are handling these cases. The typical pattern we see in all the adoption cases discussed above is that the mother gives the child for adoption, the child is placed with its potential adoptive parents, and the biological father promptly challenges the adoption. For both legal and psychological reasons, I seriously question the validity of placing the child with its potential adoptive parents despite the biological father's challenge, even though this seems a common practice. Such action may in fact be unconstitutional, and it certainly contributes to the horrendous psychological damage done to the child when and if it must be returned to the biological parent.
My objection is this: The fact that unwed biological fathers have a constitutionally protected "opportunity interest" in their offspring necessarily implies that they must at least be given the "opportunity" to exercise it, absent adequate proof of prenatal abandonment.[11] This in turn means there must be a period of time after birth during which such a biological father has a right of access to the child. This might include a tentative placement with the biological father or some kind of visitation rights, depending on the facts before the trial court. Visitation by the potential adoptive parents also may be permissible. In some situations, the child could be placed in a neutral foster arrangement with visitation by both the potential adoptive parents and the biological parent.
It deserves emphasis here that the unwed biological father's constitutional interest over the child is not fully formed at this stage and therefore can be subjected to such reasonable restrictions or limitations. His rights are simply not as extensive as those of a legally recognized father. During this period, the state also could evaluate the unwed biological father's performance and intervene at any time if his conduct required it. The trial court then could finalize the case, allowing the adoption if the father fails to adequately exercise his opportunity interest. Once again, I think six months would be a reasonable period of time for this evaluation to occur, based on the same reasons noted above, though some flexibility should exist for special cases. The overriding goal would be to settle the matter quickly so as to minimize harm to the child.[12]
Beyond its legal and psychological benefits, the procedure outlined above also has obvious benefits for the parties and the child. It permits a reasoned evaluation of any unwed father whose prenatal conduct  while not constituting an actual abandonment  has been validly questioned. This avoids defining "prenatal abandonment" so overbroadly that it impinges upon the father's constitutional opportunity interest. The procedure also does not place the potential adoptive parents in the heart-rending position of becoming emotionally invested in a child they may not receive; and it could finalize the matter earlier in the child's life, before emotional scarring is likely to be serious.[13] *977 Moreover, it leaves the child with "fallback" adoptive parents in case the father's postnatal conduct genuinely does not meet legal requirements. While the potential adoptive parents may find this "tentative" status unsettling, it is far better than parting them from a child they have kept for months or years.
Many conclusions flow from the above analysis. First, it leads me to disagree with the majority's interpretation of section 63.032(14), Florida Statutes (Supp. 1992), which I fear extends state law into the realm of the unconstitutional. I do not propose that the prenatal "conduct of [the] father toward the child's mother" is irrelevant evidence, but merely that it is relevant solely to the extent it demonstrates abandonment of the child. This is the only view that harmonizes the statute with case law and hence with the Fourteenth Amendment. The very fact the Supreme Court has recognized the biological father's "opportunity interest" necessarily means he must at least be given that opportunity if he has sincerely expressed interest in exercising it. And this would be true even if the biological father and mother have irreconcilable differences. Absent conduct detrimental to the fetus, hatred of the mother does not necessarily imply hatred of the child.
Moreover, I am entirely unwilling to say that purely prenatal conduct ever can demonstrate abandonment with respect to the child absent clear and convincing proof that the biological father either (a) unequivocally, by word or deed, indicated a complete and unconditional prenatal abandonment of the child upon which others have reasonably relied,[14] or (b) recklessly or intentionally engaged in conduct that posed a significant risk of detriment to the fetus above and beyond what may be attributable to simple lack of socioeconomic resources. In the absence of such evidence I believe the father must be given a postnatal chance to exercise his opportunity interest under any appropriate supervision that may be necessary.
Turning now to the facts, I think the present record demonstrates more than amply that the biological father had assumed "some responsibility" (in keeping with Lehr) for this child's future, and also that he had indicated a desire to exercise his opportunity interest. At least four facts demonstrate this: (1) he paid part of the couple's joint living expenses when they lived together;[15] (2) the father promptly and prenatally informed the attorney-mediator he would oppose the adoption and seek legal rights to the child; (3) the father attended one of the mother's visits to a health-care provider during her pregnancy;[16] and (4) the father purchased a crib for his baby.[17]
Thus, we have a biological father here who clearly had shown at least some prenatal interest in the child. Evidence supporting prenatal abandonment  including all of that cited by the trial court and the majority  is at best equivocal and therefore uncompelling.[18] *978 Nothing in the record indicates any conduct on his part likely to be detrimental to the fetus apart from his poverty, even though I acknowledge his interpersonal skills with respect to the mother were lacking. Moreover, he was denied meaningful postnatal access to the child by a series of events beyond his control, including an unlawful ex parte order waiving his veto rights and a court injunction. Consistent with federal case law, I believe the trial court erred in initially placing the child in the exclusive custody of the potential adoptive parents based on the record before it. Instead, an arrangement should have been made for the biological father to have access to the child for purposes of exercising his opportunity interest.
I cannot overlook the terrible consequences that now have flowed from the trial court's initial error. The record before us poses an unambiguous nightmare: potential adoptive parents who have had custody of the child for years and are emotionally invested in her, a little girl who knows no one else as her parents, a father whose rights were improperly terminated and who has had no opportunity to bond with his child, and a lawsuit that leaves this Court with nothing but sickening choices. Worse still, the record before us is sufficiently equivocal that I might have been inclined to relinquish jurisdiction for a proper and expedited determination in the trial court under the analysis I have set forth here, except for the case's odd posture. Sadly, relinquishment is pointless now, because the first six months of the child's life are over and she already has bonded with her potential adoptive parents. Because the biological father was unlawfully denied access to his child from her birth and soon thereafter filed this challenge, the only remedy is to return her to him.[19]
I must voice another concern. The majority opinion goes to some pains to stress that both financial and emotional abandonment combined are dispositive here. I do not find that the record sufficiently supports financial abandonment, since the facts it contains as well as those recited by the trial court are entirely consistent with a couple living in poverty. I am utterly unpersuaded by the "finding" that the mother was "supporting herself" because she paid half of the couple's joint expenses. I heartily doubt that any court would say an unwed professional father earning $50,000 a year has abandoned his unborn child merely because the mother also earns $50,000 and they equally divide living expenses. How, then, is the situation different when both merely earn a few hundred each month?
Unexamined assumptions can be a poison lurking in the midst of judicial opinions. And the assumption I find here is that an unwed father who lacks means has fewer rights than one with money. By any standard, poverty cannot equate to abandonment. Otherwise our society effectively would claim the right to take children away from the poor, which would constitute an appalling perversion of the law.
As to the second factor, I find the lack of emotional support toward the mother to be a very slim reed on which to hang a legal doctrine that forever parts father from child. This conclusion is all the more compelling where, as here, the trial court's own order contains findings showing that this father assumed some responsibility for the child's future  which is all the Supreme Court appears to have required. And I am even more uneasy when the evidence actually supporting the trial court's findings is seriously conflicting and not necessarily relevant, as it is here.
In all candor, I also must add that this is a conclusion in which I find no joy. However much we dance through the hoops of legal doctrine, the bitter fact remains that this is a case about a small child named Baby Emily. *979 With that image in mind, I cannot suppress a sense of abiding outrage at what our legal and governmental system has done to her. She was born August 28, 1992, and even today her legal fate is not finalized. For some three years she has known only one family  that of the potential adoptive parents  yet her biological father's rights over her have not been satisfactorily ended, at least to my mind.
In a real sense, the most victimized party here is the child. Where does the fault lie?  It rests on inadequate laws, procedural rules incapable of recognizing the needs of a small growing child, state agencies too unmindful of the biological father's rights, parties too eager to litigate, judges and lawyers who let the child's fate bog down in a quagmire of legal technicality. We all have failed Baby Emily. And while I wish the law could magically rescue her from the legal conundrum in which she lies, I see no solution that is free of tragedy. Taking her from her psychological family unquestionably will scar her, as the record itself indicates. Such a result can only be described as horrible.
Yet leaving Baby Emily with her adoptive family will set a precedent I find damaging to our society's traditional concept of a family based on blood kinship  something the nation's highest Court has clothed with significant legal protections. Our decision today may well reverberate for years to come in countless other adoptions, affecting many other biological fathers. And I genuinely believe that a concept like "lack of emotional support of the mother" can too easily lead to abusive applications selectively discriminating against the less fortunate, in favor of the privileged. This is a broader and more insidious impact that I find even more horrible for a very basic reason: It suggests that the well-to-do can come to Florida to shop for babies among an underclass unschooled in vaguely defined middle-class values underlying a concept like "emotional support."[20]
All of this points only to a single indisputable conclusion: There is a pressing need for reforming the way these cases are handled, at least to lessen the delays and the damage they bring to children. I personally urge the Family Law Rules Committee of The Florida Bar and the Florida Legislature to study possible methods of expediting review of disputes between biological and adoptive parents.[21] Clearly the present framework in which the courts operate is worsening the problem through long and largely pointless delays only too well demonstrated here.[22] We can only guess how this case might have ended had the issues been resolved quickly. But there can be no doubt this Court would not have faced so terrible a choice as it must make today: to select between hurting a helpless child or further eroding the institution of the kinship family. Because the latter is the greater evil, I dissent as to the result. But I must add that returning Baby Emily to her biological parent at this late date is an image that would haunt me for my remaining days.
*980 ANSTEAD, Justice, dissenting.
Fathers, beware. Hard cases do indeed make bad law. I fear in this case that we have made what superficially appears to be a good parental choice for a helpless child's well-being but, in doing so, have ignored both the stringent legal test and the exceptional evidentiary showing that must be made to deprive a natural parent of all parental rights. In essence, we have given our stamp of approval to a holding that a father may be deemed to have abandoned and forfeited all rights concerning his unborn child based on the father's estrangement from the child's mother, a mother, in fact, who has herself willingly renounced any parental rights to the child, and who openly opposes any relationship between the father and the child.
Our initial mistake, in my view, is in applying the concept of abandonment to prebirth situations when the concept has traditionally, and with good reason, been limited to relationships between parents and their actual, existing children. To make matters worse, we are applying it in an undisciplined fashion to a relationship between a father and an unborn child during an extremely brief period of time immediately before the child is born.[23]
As set out in an unbroken line of cases, and, indeed, made explicit in section 39.01(1), Florida Statutes (1993), abandonment means a "willful rejection of parental obligations." To be guilty of abandonment, a parent, while able, must be found to have made "no provision for the child's support" and made "no effort to communicate with the child." Id. Of course, this definition contemplates the actual birth of a child to communicate with and to support. As this Court actually wrote in In Re Adoption of Doe, 543 So.2d 741, 745 (Fla.), cert. denied, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), "there can be no statutory abandonment under chapter 39 until the child is born." However, here, as in Doe, after correctly stating this proposition, the majority promptly ignores it and embraces a concept more accommodating to the hard facts of this case. It is this initial divergence from the fundamental concept that ordinarily a child must be born before it can be abandoned, that has led this Court to now literally strip natural fathers of their parental rights even before their children are born. It is more than "fathers beware," it is now "prospective fathers beware." You now may be found to have abandoned your child even before he or she is born.
After "abandoning" the sound rule that a child cannot be abandoned until it is born, the Court next makes a misstep of similar proportion. Instead of focusing on the stringent definition of abandonment established by statute and case law, with its long pedigree, the Court actually embraces a new definition of abandonment that is again more accommodating to the hard facts we face. The trial court here held: "The marginal effort of the natural father does not evince a settled purpose to assume all parental responsibilities and the Court, therefore, declares that the child was abandoned." 647 So.2d 918, 922-23 (Fla. 4th DCA 1994).[24] In *981 approving this as a proper test for abandonment, this Court focuses on loose language in section 39.01(1) that was not intended to supplant and is at odds with the long-established stringent test of abandonment.[25] This language is used to suggest that a father may be denied any parental rights unless he can establish that he acted consistent "with a settled purpose to provide for the welfare of the child and assume all parental duties" before the child is born. Indeed, we actually said this out loud in Doe: "The failure to assume parental responsibility is abandonment and, under Lehr [v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)], is sufficient ground to deny parental rights." 543 So.2d at 749. By some mystic transformation, these magic words have been invoked to shift the burden of proof away from those seeking to cut off the natural parent's rights, and onto the natural father to prove that he has always acted with "a settled purpose to assume all parental responsibilities."[26] This transformation is made complete in Doe when the natural father's interest in his child is sacrificed in deference to the "mother's ability to provide for the best interests of the child and herself." Id. at 746.
By this action, we have effectively ignored and retreated from the long-honored and consistently stringent standard of abandonment set out in numerous Florida cases such as In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977).[27] In Noble the court reversed an adoption involving facts much more egregious than those involved herein, and declared:
Adoption completely severs parental ties. Such permanent termination of parental rights and responsibilities must not be ordered without parental consent except upon clear and convincing proof that the natural parent has conducted himself in such a way as to show a complete abandonment *982 of the child. La Follette v. Van Weeldon [sic], 309 So.2d 197 (Fla.D.C.A. 1st 1975).
We decline to follow Jones v. Allen, 277 So.2d 599 (Fla.D.C.A. 2nd 1973). That case held that something less than complete and total abandonment by natural parents was sufficient to permit adoption by strangers. Neglect by the natural parents or disinterest and failure to carry out parental obligations does not justify adoption of a child by strangers over the natural parents' objection. Temporary failures and dereliction of parents, while possibly justifying deprivation of custody, will not support judgment of adoption In re Adoption of Gossett, 277 So.2d 832 (Fla. D.C.A. 2nd 1973). We follow the stringent standard of Wiggins, supra [Wiggins v. Rolls, 100 So.2d 414 (Fla. 1958)].
Id. at 1216-17. By our ruling today, the long line of cases exemplified by Noble and Wiggins is ignored, and a new principle is announced that says: "Father, unless you can prove that you have demonstrated a settled purpose to assume all parental responsibilities, even before your child is born, you lose. Never mind that we have not warned you about this."[28]
Finally, we have sealed the natural father's fate by giving lip service to the clear and convincing standard of proof, and then effectively abandoning it by simply deferring to the trial court's fickle judgment. Judge Dewey Johnson, writing for the First District, has described the clear and convincing standard with simple eloquence:
A natural parent may submit to an adoption by giving consent. He may so conduct himself as to show a complete abandonment. But, absent the two criteria cited supra, it takes a mighty clear and convincing set of facts before the privileges and responsibilities of the father can be taken away from him.
La Follette v. Van Weelden, 309 So.2d 197, 198 (Fla. 1st DCA 1975). Litigants should properly be concerned as to whether we have now eliminated any appellate safeguard to ensure that a trial court adheres to this important standard. Here we have the specter of a trial judge conducting a trial and emphatically concluding that the father did not abandon his unborn child under any definition of abandonment. Then, after information is disclosed on rehearing that the father has a criminal past, the trial court flip-flops, and now decides that the father did abandon the child, because the father, when first informed of the pending adoption proceedings, "did not do anything other than run to the State of Florida to attempt to get a free lawyer." Incredibly, the fact that the father objected to the adoption immediately upon being contacted for the first time by the intermediary is cited as clear and convincing evidence of the father's willful abandonment of the child.
If this scenario were not enough, in itself, to demonstrate the lack of clear and convincing evidence of abandonment, we need only look to the continuation of the proceedings on appeal, where the district court initially reversed the trial judge's flip-flop, and then did its own flip-flop on rehearing en banc and split six to five in overturning the initial panel decision. It is important to note the flip-flop in the appellate court was not based on any novel legal issue, but rather on a new majority view that there was record evidence to support the trial court's holding. A difference in one vote would have left the panel decision intact. Based upon this course of events, at both the trial and appellate levels, it strains reason to conclude that the proof of abandonment in this case was so clear and convincing as "to convince the trier of fact without hesitancy."[29]
*983 The relationship between a child and his or her natural parents has long been recognized as a fundamental value in this nation and state:
The right of the parents to the custody, care and upbringing of their children is one of the most basic rights of our civilization. The emphasis upon the importance of the home unit in which children are brought up by their natural parents is one of the great humanizations of western civilization as contrasted with the ideologies of some nations where family life is not accorded primary consideration.
Beagle v. Beagle, 654 So.2d 1260, 1264 (Fla. 1st DCA 1995) (Webster, J., specially concurring) (quoting Foster v. Sharpe, 114 So.2d 373, 376 (Fla. 3d DCA 1959)). The problem of legislating a clear and fair scheme for the adoption of newborn children is difficult, but must be addressed squarely and with fairness, and in recognition of the interests of all of the parties involved. While we wish to act in the best interests of the helpless child, we do that child no honor and, indeed, do her a disservice by ignoring the long-cherished and once-recognized interests of her natural father. Family values, indeed.
NOTES
[1] Section 63.032(14), Florida Statutes (Supp. 1992), says:

"Abandoned" means a situation in which the parent or legal custodian of a child, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If, in the opinion of the court, the efforts of such parent or legal custodian to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father toward the child's mother during her pregnancy.
(Emphasis added.)
[2] Such a duty could be established in a paternity suit.
[3] DeBoer v. DeBoer, ___ U.S. ___, 114 S.Ct. 1, 125 L.Ed.2d 755 (1993).
[4] Baby Richard v. Kirchner, ___ U.S. ___, 115 S.Ct. 499, 130 L.Ed.2d 408 (1994); O'Connell v. Kirchner, ___ U.S. ___, 115 S.Ct. 1084, 130 L.Ed.2d 1054 (1995); Doe v. Kirchner, ___ U.S. ___, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995).
[5] A slightly different standard applies if the adoption is for a child greater than six months of age.
[6] The UAA defines these as "a crime of violence or of violating a restraining or protective order, and the facts of the crime or violation and the respondent's behavior indicate that the respondent is unfit to maintain a relationship of parent and child with the minor[.]" Unif.Adoption Act, § 3-504(c)(3) (1994).
[7] While it may be true that the unwed father must perform additional acts to establish his legal claim to the child, such a statement perhaps erroneously suggests that biological fathers enjoy no presumption with respect to the child. I believe the biological father does in fact enjoy a presumption that he has validly exercised his opportunity interest until such time as the parties seeking adoption meet their burden of proving otherwise. I find this the only view that squares with the United States Supreme Court's pronouncements on this question.
[8] However, it is true that the Court apparently has declined to precisely consider whether a due process interest arises between children and their foster parents of long duration. Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).
[9] By this, I mean the fact that the UAA seems to say that best-interests evidence is relevant whether or not the father challenges the adoption before or after the first six months of the child's life.
[10] This in part explains why the "best interests" standard  which incorporates the notion of the psychological family  is less relevant in early life. Where no psychological family has formed, the standard is not usually relevant absent unusual factors.
[11] My views on what constitutes proper prenatal abandonment are discussed below.
[12] Obviously, the Legislature would be within its authority in prescribing guidelines for the exercise and evaluation of the biological father's "opportunity period."
[13] There remains the problem, however, of protracted appeals. Given present constitutional constraints, there is no satisfying solution, although there is the possibility that some such cases could be taken directly to this Court by way of a habeas corpus petition. See State ex rel. Cline v. Cline, 91 Fla. 300, 107 So. 446 (1926). Of course, habeas cannot substitute for an appeal, Adams v. Culver, 111 So.2d 665 (Fla. 1959), but modifications to procedural rules or the habeas corpus statute might lessen this problem.
[14] This essentially is an estoppel concept.
[15] The record contains canceled checks that establish this fact. I frankly find the trial court's order disingenuous on this point when it states that, by paying half of the living expenses, the mother in effect was "paying her own way." Simple common sense dictates that two can live more cheaply than one, so the mother and her unborn child in fact received some financial benefit from the joint living arrangement. The facts indicate the couple were impoverished, but poverty alone clearly is no lawful reason to take a child from a natural parent.
[16] The trial court made much of the fact that the father was described as "an ice cube" during this visit. Given the stoicism inherent in the American ideal of masculinity, I frankly am surprised that such opinion testimony would be deemed relevant here. Being emotionless during a gynecological visit may indicate something sinister, or it may only indicate a nervous man trying to hide his own discomfort. I think we must be very cautious when events with multiple interpretations are used to demonize in this manner.
[17] Again, the trial court faults the father for using money from his mother to buy the crib. I would only note that it is very common for grandparents to make contributions of this kind, especially to an impoverished couple. The fact remains that the money was in the father's possession, he could have spent it however he wished, yet he chose to purchase a crib for his baby. I again must voice my fear that this father is being stripped of his parental rights in part because he is impoverished.
[18] The primary piece of evidence is the mother's assertion that the biological father told her to "do what you have to do" when she said she wanted to place the child for adoption. This utterly ambiguous evidence is severely undercut by testimony from the biological father and the attorney-mediator. The latter even said that the former expressed his desire for the child in strong terms.
[19] This would not necessarily be true had the biological father's challenge been made more than six months after the child's birth, under the analysis developed above.
[20] What may seem like sufficient "emotional support" to one judge may well utterly fail in the eyes of another. Looking back to the depression earlier in this century, I think a substantial number of American men provided less emotional support than did this father, because of the exigencies of widespread poverty. It takes little imagination to see other problems that can arise in the years ahead. If the father is away on military duty, for example, he well could be deemed to be providing insufficient emotional support  although military men at least have some protection afforded by the federal Soldier's & Sailor's Civil Relief Act. The majority is treading too far out onto a very slippery slope, thereby creating fertile soil for future lawsuits that can only harm the children who lie at the center of these controversies.
[21] Lawsuits of this type cry out for at least four broad reforms: (1) expedited review in the trial court; (2) expedited appeal; (3) swift and certain finality of court decisions; and (4) reasonable mechanisms to minimize psychological harm to the child during the legal process.
[22] One commentator has aptly noted that

the law must impose some outer time limit on the father and the court process. If the father learns of the child and comes forward relatively quickly, and the court hears the case (and any appeals) expeditiously, the risk to the child can be minimized. In addition, the court could require interim visitation with the biological father to enable him to develop a relationship with the child.
Deborah L. Forman, Unwed Fathers and Adoption: A Theoretical Analysis in Context, 72 Tex. L.Rev. 967, 1039-40 (1994) (footnote omitted).
[23] It is difficult, if not impossible, to imagine a court ruling being upheld when it is predicated upon a parent's similar conduct occurring during such a limited period of time after a child is born and when the mother and father have become estranged.
[24] Consider the analysis employed by the majority opinion on rehearing en banc in the district court:

The trial court did not and we need not distinguish between married and unmarried parents in discussing the issue of abandonment as it applies in this case. Because we conclude with a certified question, however, we suggest that there is a substantial practical and legal difference between the legal status of a birth father married to the birth mother and one who fathers a child out of wedlock. The married father is, from the outset, legally responsible to support the child. The unmarried father has no such automatic legal responsibility. He must take some positive action to assume the responsibilities of parenthood before he becomes entitled to exercise the rights of parenthood. This is only fair. It is also a recognized legal principle. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). See also, Caban v. Mamen [sic], 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). (We do not overlook the exception created by paternity suits, but that exception has no relevancy here.) It is therefore reasonable and logical to examine the question whether an unmarried father has in fact evinced a settled purpose to assume all parental duties and the corollary that if he "makes only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned." Matter of Adoption of Doe, 543 So.2d 741, 745 (Fla. 1989). The trial court found that to be the situation here.
In re Adoption of Baby E.A.W., 647 So.2d 918, 923 (Fla. 4th DCA 1994).
[25] Section 39.01(1), Florida Statutes (1985), provides:

"Abandoned" means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person responsible for the child's welfare, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or person primarily responsible for the child's welfare to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. The failure by any such person to appear in response to actual or constructive service in a dependency proceeding shall give rise to a rebuttable presumption of such person's ability to provide for and communicate with the child.
(Emphasis added.)
Interestingly, in Doe, after discussing the above provision, we stated: "We note, first, that the definition of `abandoned' is limited by its terms to chapter 39." 543 So.2d at 745.
[26] Expecting mothers, of course, even in the clearest of situations, and where they give express, written consent to give up their unborn child, still have a statutory grace period after the child is born, to change their minds. See § 63.212(1)(i)2.a., Fla. Stat. (1993). In other words, even in the clearest example of a willful abandonment in writing by a natural mother, she is given a chance to change her mind. And few would contend that this is not sound policy. Of course, mothers should have the chance to see that child and change their minds about giving the child up. The miracle of birth and the reality of a precious new human being appearing in the flesh is an incomparable event in human society.
[27] To add to the sleight of hand, the majority opinion places special emphasis on the legislature's amendment of chapter 63 to add the definition of abandonment set out in chapter 39. In particular, the majority treats the legislature's adoption of our statement in Doe that prebirth conduct of the father toward the mother may be considered in the abandonment analysis, as if it constitutes a "critical" change in the law of abandonment that we are now bound to follow. Of course, the legislative change is nothing new at all since it is simply a paraphrase of one of our holdings in Doe. More important, however, we have failed to recognize the distinction between adopting an expansive view of relevant evidence to include the prebirth conduct of the father toward the mother, a concept with which everyone agrees, and the quite distinct and radical concept of adopting the attitude of the father toward the mother as the controlling definition of abandonment of the child.
[28] And never mind that we have recognized greater rights and protections for natural mothers. As Justice Barkett candidly acknowledges in her special concurrence in Doe: "[T]he precedent set by this case cannot carry over into those situations involving the prenatal responsibilities of mothers, in which substantially different factual problems and different competing rights and interests necessarily arise and must be evaluated." 543 So.2d at 749-50. Whatever happened to equal justice under law? See also supra note 4.
[29] In other cases we have not hesitated to enforce the clear and convincing standard. In fact, most of the adoption cases involve reversals of trial court orders granting adoptions. See, e.g., In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977). In another example, we set aside sanctions against a judge based on conflicting evidence in In re Davey, 645 So.2d 398 (Fla. 1994), and characterized the proof as "a far cry from the level of proof required to establish a fact by clear and convincing evidence." Id. at 405.