912 So.2d 650 (2005)
J.S., birth father and V.B., birth mother, Appellants,
v.
S.A. and J.A., Appellees.
Nos. 4D05-156, 4D05-458.
District Court of Appeal of Florida, Fourth District.
September 21, 2005.
Rehearing Denied November 2, 2005.
*652 Portia B. Scott of Scott & Scott, Stuart, and Virginia P. Sherlock of Littman, Sherlock & Heims, P.A., Stuart, for appellants.
Betty C. Resch, Lake Worth, for appellees.
TAYLOR, J.
This appeal arises from termination of the parental rights of birth parents pending adoption of their minor child by the appellees. We affirm termination of the mother's parental rights, because the record supports the trial court's finding that the mother's consent to adoption was valid and not obtained by fraud or duress. We affirm termination of the father's parental rights, because the record supports the trial court's finding that the father abandoned the child by failing to establish his paternal rights in a prompt and timely manner.

*653 The Facts
In January 2003, the mother, V.B., became pregnant. She was sixteen years old and living with her aunt in Indiantown at the time. The mother said that the biological father could be any one of three men. J.S., who was twenty years old, was one of the men. J.S. expressed an interest in the pregnancy and wanted to know if the baby was his. The mother refused to have any contact with him because she was angry with him. J.S. admitted that he did not give the mother any financial support during her pregnancy.
On August 16, 2003, V.B. gave birth to a son, K.R.B. The baby was born two months premature. J.S. was not allowed to visit the mother in the hospital because she had instructed the staff not to admit him. However, J.S. visited the baby once during his two-week stay in the hospital. After first seeing the baby, J.S. did not believe the baby was his. But soon after the baby was released from the hospital, he started treating the child as if he were his son. J.S. visited the baby several times, and on a few occasions bought formula, diapers, and clothing for the baby. At the termination hearing, he introduced receipts for some of his purchases.
Charlotte Ruble-Coleman, a social services counselor for the Martin County Schools and the Teen Parent Center, knew the mother and her family. She referred the mother to the Teen Parent Center in Indiantown. The Teen Parent Center is a dropout prevention program which allows a student who is pregnant or who has a child to complete her high school education. The mother enrolled in the program and, while there, received individual and group counseling.
About two months after the baby was born, the father called Ruble-Coleman to discuss his situation with the school counselor. He told her that he was not sure whether he was K.R.B.'s father and was concerned because he did not have a job, house, or money, and that his immigration status was on hold. He later stopped by her office to ask if she would make some phone calls and try to get him on the Maury Povich or Jerry Springer show so that he could get a DNA test.
Catherine O'Connor, the coordinator at the Teen Parent Center, testified that the mother confided that motherhood was not what she had expected and that she wished for the freedom of a teenager. The mother did not have any financial resources and space was limited in her aunt's home, which housed nine people. The mother's aunt was concerned that the mother would sometimes leave the baby with her without letting her know beforehand. The aunt explained to the mother that if this continued the state would eventually come and take the baby. V.B. told her aunt to contact Ms. Ruble-Coleman about putting the baby up for adoption.
The mother did not have a job, money, or financial support. V.B. told her aunt that she wanted the baby to have a better life and a family that could take care of him and provide him with things she did not have. She said she wanted him to have everything he needed and that she knew she could not provide for him because she was too young and lacked the necessary resources. V.B. also told her aunt that she felt that the baby was preventing her from going out.
Ruble-Coleman recalled the mother coming to her office when the baby was around three months old and announcing that she wanted to give the baby up for adoption. The mother explained that she wanted the baby to have parents who could give him financial stability. She did not want him to be raised on the streets of Indiantown. She also wanted a couple *654 who would take him to church. The mother said she wanted to continue her education and become a nurse. Also, she just wanted be a teenager and have fun. She did not think that she could do all those things while caring for a baby. According to Ruble-Coleman, the mother wanted to place the baby for adoption immediately. She also wanted to be able to choose the adoptive parents for her baby.
On November 17, 2003, Ruble-Coleman called the First Care Crisis Pregnancy Center, an agency which works with pregnant teenagers in crisis. She spoke with Suzette Greg and explained the situation. Even though First Care is not an adoption agency, Greg arranged a session two days later for the birth mother to interview potential adoptive parents.
On November 19, 2003, Ruble-Coleman took the birth mother, the baby, and all of the baby's belongings to First Care in Jupiter. There the mother met with Suzette Greg and Sharon Brewer, the director of First Care. After interviewing two couples, the mother chose J.A., an employee of First Care, to be the child's mother. The mother was pleased that she had found the "perfect family" for the baby, a "Christian family" that could take care of him and give him everything she wanted him to have. The mother then handed the baby over to Sharon Brewer, who drove the baby away.
Five days later, the mother, the father, and Ruble-Coleman met with an adoption attorney, Lynne Baldwin, at the offices of First Care. Baldwin listed herself as the "adoption entity" in two places on the adoption forms. On the "Consent and Waiver" form, she listed the "adoption entity" as Lynne Baldwin and/or Lisa Susner. However, at the termination of parental rights hearing, Baldwin insisted that neither she, nor First Care, nor any other person involved was an adoption entity. The adoptive parents, S.A. and J.A., concede that no adoption entity was involved in this case.
Baldwin testified that her role was simply to fill out the paperwork as a favor to First Care. She put her name in the "adoption entity" space on the statutorily required forms, but did not in any way arrange this adoption or perform many of the duties required of an adoption entity. She did not conduct any pre-consent interviews, prepare a Notice of At-Risk Placement for the adoptive parents, file a notice of intended placement with the court, or prepare any monthly supervision reports, as required of the adoption entity.
At the November 24, 2003 meeting for the execution of the adoption papers, Lynne Baldwin went over each item of the documents with both the birth mother and father. She asked if they had any questions and was assured that they understood everything. The key document signed by the birth mother was the "Consent and Waiver By Parent." In that document, the birth mother relinquished all parental rights to the baby and consented to his adoption by S.A. and J.A. It recites that it is valid, binding, and irrevocable and cannot be withdrawn unless a court finds that it was obtained by fraud or duress.
Ruble-Coleman testified that the father came to the meeting intending to sign the papers. Once there, however, he questioned his paternity and refused to sign. He explained that he did not want to sign the adoption papers because if the baby was not his, he might get in trouble. He said he did not want to sign the papers if the baby was his because he wanted to be able to tell the baby later that he had fought for him.
A short time later, the father met with the adoptive parents at a McDonald's. *655 The father asked them where they lived and what they did for a living. He again expressed doubts about his paternity but told them that if the baby was his, he was not going to give up his child.
In early December 2003, upon a referral from Ruble-Coleman, the father contacted David Cardno, director of the Father Child Resource Center in Stuart. Cardno testified that his agency is part of the Martin County Healthy Start Coalition. Their mission is to provide education and assistance to new fathers. They also operate a program known as the Family Law Forum, which, through volunteer attorneys, provides legal assistance to fathers facing custody disputes and other issues concerning their children. Cardno recalled the father in this case coming to a Family Law Forum meeting and expressing concerns about not having any contact with his child and wanting to be a part of his child's life. Cardno advised the father to participate in their law forum to get more information. However, the father did not return for future meetings.
Five months later, on May 4, 2004, the father registered with the Florida Putative Father Registry. He filed a paternity action on July 1, 2004, in Martin County to establish paternity and get custody of K.R.B. On August 26, 2004, he obtained a final judgment from the Martin County Circuit Court establishing his paternity and awarding him primary residential responsibility over the child. The mother was granted secondary residential responsibility and visitation rights in accordance with an agreed schedule incorporated in the judgment.
On July 30, 2004, S.A. and J.A., the adoptive parents, filed this petition to terminate the father's parental rights pending adoption in Palm Beach County.
On November 12, 2004, the birth mother sent a letter to Lynne Baldwin and Lisa Susner, who were listed on the consent form as the adoption entity. In her letter, the birth mother advised that she was revoking her consent based on fraud and duress. She also moved to intervene in this termination proceeding.
At the hearing on the petition to terminate parental rights for the proposed adoption of K.R.B., the adoptive parents asserted that the mother consented to the proposed adoption and voluntarily surrendered her parental rights. They contended that the father abandoned the child by failing to provide support during the mother's pregnancy and failing to timely take on any parental responsibilities.
In defense, the mother claimed duress. She said that she consented to the adoption only because Ruble-Coleman, who worked for the state, told her that the state was going to take her baby away if she did not place him for adoption. She also said that she agreed to the adoption on the mistaken belief that she was going to have an open adoption, i.e., receive photographs and information about the child in the future.
Both parents contended at trial that the proposed adoption was illegal because there was no adoption entity involved in the placement, as required by Florida law.
After the hearing, the trial court terminated the parental rights of the mother and father. In her written order, the trial court found by clear and convincing evidence that the birth mother gave her consent freely and voluntarily and that the birth father abandoned his child. Though the trial court referred to this adoption as a "private placement," it did not address the arguments of both biological parents that the proposed adoption was illegal because no adoption entity was involved.

*656 Consent of the Birth Mother
Under Florida adoption law, the parental rights of the birth mother must be terminated before an adoption can be finalized. Florida Statutes Chapter 63 controls termination of the parental rights of parents who have voluntarily placed their child for adoption. The court may terminate the parental rights of the mother if the court determines by clear and convincing evidence that the mother executed a valid consent under section 63.082, Florida Statutes, and that the consent was obtained according to the requirements of Chapter 63. See Fla. Stat. § 63.089(3)(a)(2004). A minor mother may consent to the adoption of her child and relinquish control or custody of the child to an adoption entity. See § 63.082(1)(b), Fla. Stat. (2004).
Section 63.082(4)(b), Florida Statutes (2004), expressly provides that consent to an adoption can be withdrawn only if the court finds that the consent was obtained by fraud or duress. A parent who has executed her consent to an adoption has the burden of proving fraud or duress by clear and convincing evidence. See W.T. v. Dep't of Children and Families, 846 So.2d 1278 (Fla. 5th DCA 2003); K.C. v. Adoption Services, 721 So.2d 811 (Fla. 4th DCA 1998).
At the final hearing on the petition for termination of parental rights, the mother testified that she consented to the relinquishment of her parental rights only because the school social worker told her that the state would take her child away from her unless she gave him up for adoption. She said that her consent was also influenced by the counselor's assurances that this would be an "open adoption." The trial court rejected the mother's version of events surrounding her consent and concluded that the mother's consent was not given under duress. In her written order, the trial judge stated:
This Court has no doubt that the young woman in this case gave her consent freely and voluntarily for the adoption of her child. She did this so obviously out of love for her child and with the astute knowledge she could not give her son the life she wished for him. The birth mother admitted she chose the petitioners for her child. Her claim at final hearing that the woman who had helped her own mother maintain her family until her death had orchestrated the adoption and coerced her to sign the consent is incredulous. The birth mother's claim that the reason for her consent was Ms. Coleman's indicating that her baby would be taken away by the state if she did not put him up for adoption is unreasonable in light of the actions of Ms. Coleman, the testimony of all the witnesses and in light of the demeanor of the birth mother.
The court further noted that the adoption papers were carefully explained to the birth mother and that there was nothing in the evidence to support the birth mother's claims of fraud, duress, deceit or misrepresentation. We do not disturb the court's conclusion that the mother's consent was given freely and voluntarily and was not obtained under fraud or duress.
The trial court, however, did not address the second issue raised by the mother: that her consent and surrender of the child without the involvement and supervision of an adoption entity violated the adoption laws and therefore invalidated her consent.
The mother argues that her consent was obtained without affording her and the child the safeguards of statutory provisions governing voluntary placements of children for adoption. Specifically, the mother argues that the private placement *657 of her child without the intervention of an adoption entity violated Florida law, which requires that an adoption entity be involved whenever a child is being placed for adoption with someone other than a relative or stepparent. Here, because there was no adoption entity involved in the placement and supervision of the child, many of the duties required of an adoption entity were not performed. The mother asserts that neither she nor the prospective adoptive parents should be permitted to waive these statutory requirements.
Section 63.212(1)(b), Florida Statutes (2004), provides that it is unlawful for any person "[e]xcept an adoption entity, to place or attempt to place within the state a minor for adoption unless the minor is placed with a relative or with a stepparent." If done with criminal intent, this is a third degree felony. See § 63.212(8), Fla. Stat. (2004). Since every adoption involves the placement of a child and only adoption entities are allowed to place, it logically follows that an adoption entity must be involved in every non-relative/step-parent adoption.
Chapter 63 also specifies that an adoption entity be involved in a minor parent's placement of her child for adoption. Section 63.082(1)(b), Florida Statutes (2004), states that a minor parent, "has the power to relinquish his or her control or custody of the child to an adoption entity." This implies that a minor does not have the power to relinquish custody of the child to anyone other than an adoption entity. See Moonlit Waters Apartments, Inc. v. Cauley, 666 So.2d 898 (Fla.1996) (relying on principle of statutory construction, expressio unius est exclusio alterius, mention of one thing implies exclusion of another).
An "adoption entity" is defined in section 63.032 as:
[T]he department, an agency, a child-caring agency registered under s. 409.176, an intermediary, or a child-placing agency licensed in another state which is qualified by the department to place children in the State of Florida.
The term "agency" means "any child-placing agency licensed by the department pursuant to s. 63.202 to place minors for adoption." § 63.032(5), Fla. Stat. (2004). It is undisputed that First Care is not an adoption agency, licensed or otherwise.
The term "intermediary" means "an attorney who is licensed or authorized to practice in this state and who is placing or intends to place a child for adoption...." § 63.032(9), Fla. Stat. (2004). Attorney Lynne Baldwin testified that she did not "in any way, arrange this adoption," or "place" the child. The term "place" is broadly defined by the statute as follows:
"To place" means the process of a parent or legal guardian surrendering a child for adoption and the prospective adoptive parents receiving and adopting the child, and includes all actions by any person or adoption entity participating in the process.
§ 63.032(15), Fla. Stat. (2004).
We agree that Lynne Baldwin, who testified that she was merely doing the paperwork as a favor to First Care, was not acting as an "intermediary" or "adoption entity" in this case. See In re Adoption of a Minor Child, 593 So.2d 185, 188 (Fla. 1991) (concluding that an attorney, who was merely the legal representative hired to file the necessary pleadings to effectuate the adoption, was not an "intermediary handling the adoption" within the ordinary meaning of those words).
The Florida Legislature clearly contemplated that an adoption entity be involved in all non-relative/non-stepparent *658 adoptions handled under Chapter 63. Under the statutory scheme permitting parents to voluntarily surrender rights to their children, the main purpose of the "adoption entity" rule is to prevent baby-selling and inappropriate placement of children. See Adoption Hot Line, Inc. v. State, Dep't of Health and Rehabilitative Servs., 385 So.2d 682, 684 (Fla. 3d DCA 1980) (affirming a temporary injunction against an unlicensed "adoption hotline" to prevent its advertising and placement activities). Approved adoption agencies are also designed to protect natural parents from precipitous decisions. Their task is to serve the interests of adoptive parents and the welfare of the child as well. See Sees v. Baber, 74 N.J. 201, 377 A.2d 628 (1977).
Section 63.039, Florida Statutes, imposes affirmative duties on adoption entities for the protection of the birth parents, the adoptive parents, and the child. It provides sanctions for an adoption entity's failure to perform certain duties. Among the many statutory duties imposed on adoption entities are the requirements to prepare a Notice of At-Risk Placement for the adoptive parents, conduct pre-consent interviews of the birth parents, give notice to the court within 48 hours of the adoptive parents taking custody for the court's preliminary approval, and file monthly supervision reports with the court. All of these requirements went unmet in this case because no adoption entity was involved.
One deficiency in the proceedings here that particularly concerns us is the failure of an adoption entity to interview the mother before she executed her consent. Section 63.082(3)(b) requires a representative of the adoption entity to interview the parent before she executes the consent. A summary of the interview must then be filed with the petition to terminate parental rights. Although there is testimony indicating that Attorney Baldwin carefully explained the consent forms to the mother and made the disclosures to her required by section 63.085(1), the record shows that the mother was not given the required pre-consent interview. Therefore, no summary of the interview was filed with the petition. This interview is undertaken to ensure that a parent's consent is informed and voluntary. See Hindman v. Bischoff, 534 So.2d 743, 744 (Fla. 2d DCA 1988) (finding that the mother's consent was given knowingly where the HRS caseworker met with her for the statutorily required pre-consent interview).
The mother argues that because the placement of her child without an adoption entity was unlawful, her consent to the adoption was not executed in accordance with the law and thus cannot form the basis for termination of her parental rights.
As mentioned above, the Legislature has provided criminal sanctions against those who place or attempt to place children without an adoption entity. But it has not provided the remedy of invalidating an adoption where the child was placed without the intervention of an adoption entity. Although we recognize the serious implications of non-compliance with these statutory provisions governing adoption entities, section 63.2325, Florida Statutes (2004), limits our authority to revoke consent to an adoption based on a failure to comply with statutory requirements. Section 63.2325, Florida Statutes, states:
Conditions for revocation of a consent to adoption or affidavit of nonpaternity.  Notwithstanding the requirements of this chapter, a failure to meet any of those requirements does not constitute grounds for revocation of a consent to adoption or withdrawal of an affidavit of nonpaternity unless the extent and circumstances *659 of such a failure result in a material failure of fundamental fairness in the administration of due process, or the failure constitutes or contributes to fraud or duress in obtaining a consent to adoption or affidavit of nonpaternity.
Though the reliability of consent in the context of an unstructured private placement is open to grave question, the record supports the court's finding that the mother's consent resulted from social and financial pressures and not from fraud or duress. Several witnesses testified to the mother's purposeful, knowing, and voluntary decision to relinquish her parental rights. Any prejudicial impact from non-compliance with the statutory requirements appears unlikely where, as here, the mother did not attempt to withdraw her consent soon after the surrender, but waited almost a year before seeking to revoke her consent. Further, the record does not demonstrate that the absence of an adoption entity denied her fundamental fairness in the administration of due process.

Abandonment by the Father
The trial court excused the father's consent to adoption upon finding that he abandoned the child. The court may excuse the father's consent to adoption if it finds by clear and convincing evidence that the father has abandoned the minor child. § 63.089(3)(e), Fla. Stat. (2004). As defined in Chapter 63, the term:
(1) "Abandoned" means a situation in which the parent or person having legal custody of a child, while being able, makes no provision for the child's support and makes little or no effort to communicate with the child, which situation is sufficient to evince an intent to reject parental responsibilities. If, in the opinion of the court, the efforts of such parent or person having legal custody of the child to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.
§ 63.032, Fla. Stat. (2004).
The court based its finding of abandonment on its opinion that the father's efforts to care for the child were marginal and that his delay in asserting his paternal rights did not evince a settled purpose to assume all parental duties. Among the reasons listed by the court for finding abandonment were that the father gave no support to the mother during her pregnancy, and that he waited nine months before filing his claim of paternity with the Putative Father Registry and almost a year before instituting a legal action to establish paternity.
Because of the sanctity of the biological connection between parent and child, a finding of abandonment must be supported by clear and convincing evidence. See In Re Adoption of Baby E.A.W, 658 So.2d 961, 967 (Fla.1995). "The determination of abandonment is fact-specific and, absent direction from the Legislature, we cannot dictate to trial courts precisely how to evaluate the factors that go into making this decision." Id. at 966. Appellate review of the trial court's findings is severely limited. "[O]ur task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute our judgment for that of the trier of fact. Instead, we will uphold the trial court's finding `[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court's judgment in favor of terminating . . . parental rights.'" Id. *660 (quoting Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993)).
During the mother's pregnancy and after the baby's birth, the father vacillated between questioning his paternity and denying it outright. Furthermore, he failed to provide the mother with any financial support during her pregnancy. This is a factor that trial courts can consider in deciding the abandonment issue. See E.A.W, 658 So.2d at 967; Matter of Adoption of Doe, 543 So.2d 741 (Fla.1989); see also § 63.032(1). However, the adoption statute defines "abandoned" as a situation where the parent makes no support provisions "while being able." Pursuant to section 63.089(4)(a), the court must consider the needs of the child and the relative means and resources available to the person alleged to have abandoned the child. Here, other than testimony of the school counselor that the father was unemployed after the child's birth, the record contains little or no evidence regarding the father's financial ability to provide support during the mother's pregnancy. If the father's failure to give support during that time was attributable to his financial inability to do so, his parental rights cannot be terminated on that basis. See In Interest of B.W., 498 So.2d 946 (Fla.1986) (holding that the father of the minor children, the subject of a petition to terminate parental rights, had not abandoned his children based merely on his failure to pay child support due to his incarceration). Because the record does not contain sufficient evidence of the father's ability to pay support during the mother's pregnancy, we do not affirm the court's abandonment ruling on nonsupport grounds.
After the child was born, and during his first three months, the father visited the child and provided him with some baby supplies. Throughout this period he continued to express doubt about his paternity, yet took no steps to confirm whether he was, in fact, the child's father. When the child was a little over three months old, the teenage mother, lacking adequate housing and financial support, decided to place the child for adoption. She executed her consent at the November 2003 meeting in the attorney's office. The father refused to sign the adoption papers, still voicing uncertainty about his paternity. He said that if the baby was really his, he was not going to give him up. When he later met informally with the adoptive parents at a McDonalds restaurant, he again said that if the baby was his, he was going to fight for him.
However, six months passed before the father finally acknowledged his paternity by registering with the Florida Putative Father's Registry. Another two months went by before he filed an action in court to establish paternity and obtain custody. By this time, the baby was almost a year old and had been in the adoptive couple's home for over eight months.
In excusing the father's consent to adoption, the trial judge said in her written order that the father's fight for his son "comes too late." She said: "Florida adoption laws may be confusing, but they are clear about one thing: the legislature will no longer let children whose parents do not affirmatively and adequately care for them linger in the purgatory of uncertain security and love." She cited section 63.053, Florida Statutes (2004), which provides:
63.053 Rights and responsibilities of an unmarried biological father; legislative findings. 
(1) In enacting the provisions contained in this chapter, the Legislature prescribes the conditions for determining whether an unmarried biological father's actions are sufficiently prompt and substantial so as to require protection of a *661 constitutional right. If an unmarried biological father fails to take the actions that are available to him to establish a relationship with his child, his parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the available legal steps to substantiate a parental interest.
(2) The Legislature finds that the interest of the state, the mother, the child, and the adoptive parents described in this chapter outweigh the interest of an unmarried biological father who does not take action in a timely manner to establish and demonstrate a relationship with his child in accordance with the requirements of this chapter. An unmarried biological father has the primary responsibility to protect his rights and is presumed to know that his child may be adopted without his consent unless he complies with the provisions of this chapter and demonstrates a prompt and full commitment to his parental responsibilities.
Here, the trial court determined that the father failed to demonstrate "a prompt and full commitment to his parental responsibilities" by allowing nine months to elapse between the time the child was born and the time he asserted his claim of paternity. In the trial court's judgment, this delay was substantial enough to excuse his consent and terminate his parental rights.[1] We are bound to uphold the court's judgment if there is any theory or principle of law which would support it. E.A.W., 658 So.2d at 967 (quoting Kingsley, 623 So.2d at 787).
The United States Supreme Court has held that an unwed father has a protected interest in establishing a relationship with his child so long as he demonstrates a full commitment to fatherhood and does not delay in assuming his parental responsibilities. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). On this premise, the Legislature has sent a clear message that an unmarried biological father who intends to solidify his parental rights must come forward and "demonstrate a timely and full commitment to the responsibilities of parenthood" by providing care and support and by establishing legal paternity rights. See § 63.022(1)(e), Fla. Stat. (2004). Allowing a father to "sit on his rights" or remain on the fence indefinitely would undermine the state's "compelling *662 interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." See § 63.022(1)(a), Fla. Stat. (2004).
The trial court could properly find that the father's delay in legally acknowledging paternity was too long to "evince a settled purpose to assume his parental responsibilities," particularly where, as here, the child was with the adoptive parents for a significant period of time and had bonded with them. As the Florida Supreme Court said in Doe:
[T]here may well be circumstances where a natural father does not acknowledge or declare a parental interest in the child until after the child has been with the adoptive parents for a significant period of time during which substantial bonding has occurred. In such a case bonding would be a material consideration on the issue of abandonment. The child's well-being is the raison d'etre for determining whether a child has been abandoned by a parent or parents.
543 So.2d at 744.
Courts agree that the passage of time can be harmful to the well-being of a child and that a stable home environment for the child deserves consideration along with the interest of biological parents. See Adoption of Michael H., 10 Cal.4th 1043, 898 P.2d 891, 43 Cal.Rptr.2d 445 (1995) (holding that father's constitutional interest is inchoate and does not ripen into constitutional rights that he can assert to prevent adoption unless he proves that he has promptly come forward and demonstrated full commitment to his parental responsibilities); Matter of Kailee C.C., 179 A.D.2d 891, 579 N.Y.S.2d 191, 192 (1992) ("Bearing in mind a child's need for early permanence and stability, the key to the unwed biological father's constitutional right to consent to the adoption is the prompt assertion of his interest and a manifestation of his ability and willingness to assume custody of the child. . . ."); Matter of Adoption of Baby Boy D., 742 P.2d 1059, 1067-68 (Okla.1985) ("Children are not static objects. They grow and develop, and their growth and development require more than day-to-day satisfaction of their physical needs . . . . [A] child's need for permanence and stability, like his or her other needs, cannot be postponed. The need for early assurance of permanence and stability is [therefore] an essential factor in a constitutional determination. . . of whether or not to protect [an unwed father's] potential relationship with his child."); In re Baby Girl Eason, 257 Ga. 292, 358 S.E.2d 459, 462-63 (1987) (although an unwed father has an "opportunity interest" in developing a parent-child relationship under the due process and equal protection clauses of the Fourteenth Amendment, that interest "begins at conception" and may be lost if not timely and diligently pursued).
After hearing and weighing all the evidence in this case, the trial court concluded that there was clear and convincing evidence that the father failed to exercise reasonable diligence and firmness in establishing his paternity and that his actions fell short of showing a settled purpose to assume parental responsibilities for the child. We are not permitted to reweigh the evidence or substitute our judgment for that of the trial court. See S.C. v. A.L.A., 736 So.2d 744 (Fla. 4th DCA 1999) (affirming trial court's finding of abandonment after applying standard of review which prohibits appellate court from reweighing testimony and evidence).
Because the record sufficiently supports the court's ruling, we affirm the order *663 excusing the father's consent and terminating his parental rights pending adoption. We have considered the other arguments raised by the birth parents and find that they do not warrant reversal.
Affirmed.
STEVENSON, C.J. and HAZOURI, J., concur.
NOTES
[1] The trial court did not rely on the adoptive parents' argument that the father's consent was not required under the recently enacted provisions of section 63.062(2), Florida Statutes (2004). Those provisions require an unmarried biological father to file a claim of paternity with the Florida Putative Father Registry before the mother executes her consent for adoption, if the child is younger than 6 months old when placed with the adoptive parents. If the father fails to comply with this requirement and other duties imposed in this section, he is "deemed to have waived and surrendered any rights in relation to the child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption of the child is not required." § 62.062(2)(d).

We simply cannot determine from reading the statute whether the Legislature intended to cut off the rights of a biological father who failed to acknowledge paternity by the time the mother executed her consent, where, as here, the father had become the child's "legal father" by the decree of paternity by the time of the termination hearing.
We also comment on our concern about potential due process problems in rigidly applying these provisions without regard to good cause exceptions or extenuating circumstances. In this case, we have no such concerns because the father became aware of his potential paternity claim during the mother's pregnancy and had three months following the child's birth to file an acknowledgement of his paternity before the mother executed her consent to adoption.