FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D18-4552
_____

C.G. and C.G.,

    Appellants,

    v.

R.C.,

    Appellee.

_____

On appeal from the Circuit Court for Union County.
David P. Kreider, Judge.

September 12, 2019

JAY, J.

Appellants C.G. and C.G. filed a petition to terminate the parental rights of Appellee R.C. to the minor child, R.—Appellee's son by C.G.—pending adoption of R. by C.G.'s husband. Appellee, who is incarcerated, refused to give his consent to the adoption. Therefore, Appellants set out to prove by clear and convincing evidence that Appellee had abandoned R. by being incarcerated during a significant period of R.'s minority. Following a hearing, the trial court entered its Order Denying Petition to Terminate Parental Rights and Petition for Adoption, in which, through its interpretation of the relevant statute, denied Appellants' petition. We agree with Appellants that the trial court misconstrued the relevant statutory provisions and reverse the final order.

# I.

Appellee was incarcerated on drug trafficking charges in January 2010, less than a month before R.'s fifth birthday. His tentative release date is March 17, 2023. R. will be eighteen at the time of release. Prior to Appellee's incarceration, he had physical custody of R. and his daughter—R.'s biological older sister—since R. was six months old. When R. was four, however, his sister went missing while Appellee was working. Tragically, the sister has never been found.

Appellants, who had gone through an on-again, off-again relationship for approximately eleven years, ultimately married in December 2014. After Appellee was arrested on drug trafficking charges and incarcerated in 2010, the mother, C.G., sought and obtained custody of R. She testified that her son was "a broken little boy" when she gained custody of him—abusing animals and urinating on the floor. She described him as being "real quiet, just . . . like empty." As a result, the trial court ordered counseling for R. with Dr. Christy Monaghan, who saw him once a week for a little over a year.

According to C.G., R. knew his father was in prison, but to her knowledge, did not know why he was in prison until she later told him he had been incarcerated for drugs. Until 2013, once or twice a month, R. would be taken to the prison to visit Appellee by his paternal grandmother and great-grandmother. But C.G. testified that when R. returned home from the visits, he would be angry and "act out." Appellee sent cards to R. at Christmas and on his birthday, but C.G. left it up to R. whether to respond to Appellee; he chose not to.

C.G. admitted that the Department of Children and Families removed R. from her custody in 2013 when a dependency case was opened. In 2015, R. was reunited with his mother, but Appellee was denied visitation rights. R. also resumed counseling through the Department due to what his mother claimed were "really bad anger outbursts." To her knowledge, R. made it clear to the counselor that he did not want to have anything to do with Appellee. C.G. announced she had been "sober" since the end of 2013. At the time of the hearing, C.G. testified that R. was in the eighth grade, was doing well, was happy, and laughed. She stated

2

that her husband, C.G., functioned as a "dad" for R., and expressed her belief that the two had "bonded."

For his part, Appellee testified that when he was first incarcerated, his mother and grandmother would bring R. to visit him in prison once or twice a month, testimony that was confirmed by both women. During these visits, Appellee's mother would present R. with clothes and other gifts because Appellee had no independent source of income to purchase such items. Appellee "absolutely" believed he had formed a bond with his son. He did not want his parental rights to R. terminated, because he loved him. He agreed with counsel that he had done everything in his power to remain in R.'s life while incarcerated and testified that he would not be a danger to his son. He admitted that he had not been in favor of the counseling R. received after his sister disappeared, and insisted R. never exhibited any behavioral problems while he was living with him. In a turnabout, however, Appellee later conceded his son had been traumatized and had possibly needed counseling over the past years.

## II.

The trial court's decision to deny Appellants' petition to terminate Appellee's parental rights to R. pending their petition for stepparent adoption, was predicated on a complex, interlocking interpretation of the factors in section 63.089, Florida Statutes (2017). Those factors placed on Appellants multiple, overlapping burdens to prove by clear and convincing evidence not only that Appellee's period of incarceration was for a significant period of R.'s minority, but also that Appellee had, in general, "abandoned" R., as that term is defined in section 63.032, Florida Statutes, and further, that Appellee had abandoned R. according to the elements set forth in section 63.089(4)(a)1.-4., Florida Statutes.

## A.

The order on review presents a pure question of law and statutory interpretation. Therefore, our review is de novo. *Townsend v. R.J. Reynolds*, 192 So. 3d 1223, 1225 (Fla. 2016) (citing *Daniels v. Fla. Dep't of Health*, 898 So. 2d 61, 64 (Fla. 2005)). Our analysis must begin with "the actual language used in the statute." *Id.* at 1228 (citing *Joshua v. City of Gainesville*, 768 So.

2d 432, 435 (Fla. 2000)); *accord Lopez v. Hall*, 233 So. 3d 451, 453 (Fla. 2018) (citing *Holly v. Auld,* 450 So. 2d 217, 219 (Fla. 1984)). It is beyond dispute that "'[w]here the statute's language is clear or unambiguous, courts need not employ principles of statutory construction to determine and effectuate legislative intent.'" *Id.* (quoting *Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 439 (Fla. 2013) (citing *Fla. Dep't of Children & Family Servs. v. P.E.*, 14 So. 3d 228, 234 (Fla. 2009))). "Instead, when clear and unambiguous, 'the statute's plain and ordinary meaning must control . . . .'" *Id.* (quoting *Daniels*, 898 So. 2d at 64–65); *see also In re Adoption of Baby E.A.W.*, 658 So. 2d 961, 966 (Fla. 1995).

Only when the language of the statute is ambiguous does a court turn to the rules of statutory interpretation and construction. *Anderson v. State*, 87 So. 3d 774, 777 (Fla. 2012). One such rule of construction mentioned in *Anderson* is the doctrine of *in pari materia*, which "requires courts to construe statutes that relate to the same subject matter together to harmonize those statutes and give effect to legislative intent." *Id. Anderson* went on to observe that similar to the doctrine of *in pari materia* is the principle that a statute "be read as a consistent whole," according "meaning and harmony to all of its parts, with effect given to every clause and related provision." *Id.* (citing *Larimore v. State*, 2 So. 3d 101, 106 (Fla. 2008)). Although the trial court in the present case did not expressly cite to these two rules of construction, the tenor of its analysis suggests that it effectively employed them. It is our view, however, that the court needlessly went beyond the plain meaning of the statute.

The language of section 63.089(4) is clear and unambiguous. Unpacked, it provides a cascade of independent factors for the trial court to evaluate in determining the issue of abandonment. To begin with, section 63.089(3), Florida Statutes, provides in relevant part:

> **Grounds for terminating parental rights pending adoption**.--The court may enter a judgment terminating parental rights pending adoption if the court determines by clear and convincing evidence, supported by written findings of fact, that each person whose consent to adoption is required under s. 63.062:

4

. . . .

(e) Has been properly served notice of the proceeding in accordance with the requirements of this chapter *and has been determined under subsection (4) to have abandoned the minor*; . . .

(Emphasis added.)

Section 63.089(4), Florida Statutes, adds:

**Finding of abandonment**.--A finding of abandonment resulting in a termination of parental rights must be based upon clear and convincing evidence that a parent or person having legal custody has abandoned the child in accordance with the definition contained in s. 63.032. A finding of abandonment may also be based upon emotional abuse or a refusal to provide reasonable financial support, when able, to a birth mother during her pregnancy or on whether the person alleged to have abandoned the child, while being able, failed to establish contact with the child or accept responsibility for the child's welfare.

Section 63.032(1), Florida Statutes, defines "abandoned" to mean

a situation in which the parent or person having legal custody of a child, while being able, makes little or no provision for the child's support or makes little or no effort to communicate with the child, which situation is sufficient to evince an intent to reject parental responsibilities. If, in the opinion of the court, the efforts of such parent or person having legal custody of the child to support and communicate with the child are only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. In making this decision, the court may consider the conduct of a father towards the child's mother during her pregnancy.

5

Having referenced abandonment as defined in section 63.032(1), section 63.089(4) continues:

(a) In making a determination of abandonment at a hearing for termination of parental rights under this chapter, the court shall consider, among other relevant factors not inconsistent with this section:

1. Whether the actions alleged to constitute abandonment demonstrate a willful disregard for the safety or welfare of the child or the unborn child;

2. Whether the person alleged to have abandoned the child, while being able, failed to provide financial support;

3. Whether the person alleged to have abandoned the child, while being able, failed to pay for medical treatment; and

4. Whether the amount of support provided or medical expenses paid was appropriate, taking into consideration the needs of the child and relative means and resources available to the person alleged to have abandoned the child.

Subsection (4)(a) requires no parsing. According to its terms, the trial court will make a finding of abandonment as defined in section 63.032(1) and, in doing so, consider the four factors in subparagraphs 1.-4.

But, section 63.089(4)(b), Florida Statutes, contemplates a distinctly different scenario, as is evident in its opening sentence:

*The child has been abandoned* when the parent of a child is incarcerated on or after October 1, 2001, in a federal, state, or county correctional institution *and*:

1. The period of time for which the parent has been or is expected to be incarcerated will constitute a significant portion of the child's minority. In determining whether the period of time is significant, the court shall

consider the child's age and the child's need for a permanent and stable home. The period of time begins on the date that the parent enters into incarceration; . . . .

(Emphasis added.) The emphasized language of this paragraph is unassailably definitional. It expresses the essential nature of "abandonment" in the context of an incarcerated parent who will remain so for a "significant portion of the child's minority." § 63.089(4)(b)1., Fla. Stat. In addition, paragraph (b) dictates that, in determining whether the period of incarceration is "significant," the court "shall consider the child's age and the child's need for a permanent and stable home." *Id.* By its clear terms, subsection (4)(b) is an independent, alternative means of establishing abandonment.

In the instant case, however, the trial court applied the factors in section 63.089(4) linearly, beginning with the introductory reference to the definition of abandonment in section 63.032, then proceeding downward to the salient considerations in subsections (4)(a) and (4)(b). The result was a legal analysis that eviscerated the legislative concept of abandonment through incarceration. The significance of this misplaced examination is evidenced by the way in which the court evaluated the facts under section 63.089(4)(b)1.:

> The Father was incarcerated in January 2010. The [F]ather's tentative release date is March 20, 2023, which is after the child reaches the age of 18. The period of incarceration will be 13 years. The child is currently 13 years old. . . . While few people could argue 13 out of 18 years is not a significant period of time, the child has not *also been abandoned* by the [F]ather *as required by section 63.089(4) and defined in section 63.032, Fla. Stat. Therefore, the ground for termination listed in section 63.089(4)(b), Fla. Stat. has not been met.*

There is no foundation in section 63.089(4) to support the emphasized language in the above-quoted paragraph. Put another way, there is no suggestion in the statutory language that abandonment in the context of section 63.089(4)(b) is contingent on any other definition of abandonment that precedes it in the statute. Lending credence to this notion that section 63.089(4)(b) offers up separate reasons for finding abandonment is the fact that

7

it proposes three distinct disjunctive scenarios of parental incarceration that would constitute abandonment. *See* § 63.089(4)(b)1.-3, Fla. Stat. Unquestionably, by its plain terms, section 63.089(4)(b) is to be read separate and apart from section 63.089(4) and (4)(a).

Moreover, the trial court's misapprehension that the definition of "abandoned" in section 63.032(1) overlays all of section 63.089(4) led it to accord undue importance to the Second District's opinion in *In re B.W.G.*, 198 So. 3d 1025, 1027 (Fla. 2d DCA 2016), and that decision's emphasis on the parent's conduct as manifesting a settled purpose to permanently forgo all parental rights—behavior evincing a complete relinquishment of responsibility. But *B.W.G.* did not involve an incarcerated parent. The analysis in that case proceeded under sections 63.032 and 63.089(4)(a).

However, and as noted by the trial court below, the Second District in *B.W.G.* further observed that "incarceration alone does not constitute abandonment as a matter of law," citing to *T.H. v. Dep't of Children & Family Servs.*, 979 So. 2d 1075, 1080 (Fla. 2d DCA 2008), *J.T. v. Dep't of Children & Family Servs.*, 819 So. 2d 270, 272 (Fla. 2d DCA 2002), and, lastly, *R.R. v. M.M.*, 143 So. 3d 449, 450 (Fla. 2d DCA 2014). That observation is sound, and section 63.089(4)(b) reflects its wisdom by predicating abandonment under that subsection not on incarceration alone, but on a period of incarceration that will constitute "a significant portion of the child's minority" and requiring the court to consider "the child's age and the child's need for a permanent and stable home." Moreover, *T.H.*, *J.T.*, and *R.R.* involved different facts and proceeded under chapter 39.

The trial court acknowledged the Fifth District's observation in *M.S.B. v. R.B.*, 93 So. 3d 532 (Fla. 5th DCA 2012) (Mem.), that "[s]ection 63.089(4)(b), Florida Statutes (2011), provides that where a parent is or will be incarcerated for a significant period of a child's minority, the child is *deemed* to have been abandoned." *Id.* at 532 n.1. (emphasis added). The trial court concluded, however, that "[i]f incarceration for a significant period of the child's minority should, by itself, constitute grounds for termination of parental rights absent a finding that the parent also

8

did not abandon the child according to the definition of section 63.032(1), the legislature should amend the statutes to reflect this." That conclusion is not consistent with the statute, since the unambiguous language of section 63.089(4)(b) provides that "[t]he child has been abandoned *when*" the parent will be incarcerated for a significant period of the child's minority. (Emphasis added.) The Fifth District in *M.S.B.* got it right.

Appellee defends the trial court's reliance on the introductory language of section 63.089(4) by analogizing it to the statutory analysis employed in *Hilton v. State*, 961 So. 2d 284 (Fla. 2007). In *Hilton*, the Florida Supreme Court declared: "It is a question of statutory interpretation as to whether section 316.610 of the Florida Statutes permits a [traffic] stop for a cracked windshield on the basis that the crack renders the windshield 'not in proper adjustment or repair,' even if the crack does not otherwise render the vehicle unsafe." *Id.* at 288. To resolve the question presented, the supreme court was asked to interpret two independent statutes. First, it considered section 316.610, Florida Statutes, which addresses the safety of vehicles and provides that a vehicle is unsafe when it (1) is "in such unsafe condition" as to be dangerous; (2) "does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required" in chapter 316; or (3) is "equipped in any manner in violation" of chapter 316. *Id.* In the event that any of the foregoing violations is observed by law enforcement, the law enforcement officer is authorized to stop the vehicle and inspect it. Because the officer in *Hilton* performed a traffic stop based on a cracked windshield, the supreme court by necessity had to turn to section 316.2952, Florida Statutes, which "enumerates the specific windshield requirements for Florida vehicles." *Id.* at 289. To understand how the two statutes applied to the facts before it, the supreme court turned to "the introductory paragraph of 316.610" and focused on that portion providing "that it is a violation for a vehicle to be driven 'which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment *as required in this chapter*.'" *Id.* (emphasis in original).

But it went on to observe that the section governing windshields in chapter 316—section 316.2952—"requires only: (1)

9

that a vehicle have a windshield in a fixed and upright position that is equipped with safety glazing; (2) that the windshield be equipped with a driver-controlled device for cleaning moisture from the windshield; and (3) that windshield wipers be maintained in good working order. See § 316.2952, Fla. Stat. (2001)." *Id.* In giving effect to the operative language in both statutes, the supreme court reasoned that

> any other problems with windshields, such as chips, dings, or cracks, are not within section 316.2952 and do not constitute a traffic violation under that statute. To conclude that any defect or damage renders a vehicle's equipment "not in proper adjustment or repair," and, therefore, subject to stop and inspection by law enforcement officers pursuant to section 316.610(1), *would ignore the language in the introductory paragraph* of the statute which provides that it is a violation for a vehicle not to have equipment that is in proper condition or adjustment "as required in this chapter."

*Id.* at 289-90 (emphasis added). In short, the introductory language in section 316.610 was necessary to generally define the violation, but required the supreme court to independently reference section 316.2952 to determine the statutory requirements for windshields in order to find if a violation had in fact occurred.

In this case, Appellee seizes on the supreme court's reliance in *Hilton* on the "introductory language" of section 316.610, and urges that the "introductory language" of section 63.089(4) be given the same gloss. However, the statutory analysis employed in *Hilton* is unsuitable for understanding how section 63.089(4) operates for the simple reason that, at issue here, is a comprehensive statutory formula for determining if a child has been abandoned by a parent, not a singular statute setting forth guidelines for vehicular safety that requires the factfinder to search chapter 316 for the discrete vehicular equipment requirements. That process requires reading different statutory sections *in pari materia.* But the introductory language of section 63.089(4) does not require going outside the statutory criteria apart from the reference to section 63.032. It does not alter the fact

10

that section 63.089(4)(b) provides an alternative ground for a finding of abandonment. To apply *Hilton* chapter and verse here would be to ignore the clear and unambiguous language of section 63.089(4).

Accordingly, the trial court erred as a matter of law in concluding that the ground for termination listed in section 63.089(4)(b) had not been met because Appellants failed to prove by clear and convincing evidence that Appellee abandoned R. as that term is defined in section 63.032(1) and section 63.089(4)(a). As a result, the cause must be remanded for the court to reconsider Appellants' petition under the correct interpretation of the statute.

B.

Moreover, due to evidentiary errors committed by the trial court, a new hearing is required on remand. Specifically, the trial court erred in ruling that Appellants could not present the testimony of Detective Piscitello because it was not relevant, and in denying Appellants' "Motion to Review Dependency File in Baker County."

Appellants proffered the testimony of Detective Piscitello, which revealed that he would be testifying to the events surrounding the disappearance of Appellee and C.G.'s young daughter, Haleigh, while she and R. were in Appellee's custody. Detective Piscitello would have testified that Appellee left his children in the care of his then seventeen-year-old girlfriend—who had a known drug abuse issue—while Appellee worked the night shift at his job. Detective Piscitello stated that when he arrived at the scene in the early morning hours of February 10, 2009, Appellee was agitated, had an injury to his hand from punching a door, and seemed intoxicated and emotional. The investigation was still active at the time of the hearing and no one had been charged with Haleigh's disappearance. The relevance of the proffered testimony is undeniable. Appellee's judgment in leaving his two young children in the care of a drug-addicted teenager highlights the issue of R.'s need for a stable and permanent home.

On remand, the trial court should permit Detective Piscitello to testify.[*]

Lastly, in denying Appellants' motion to review the Baker County dependency file, the trial court ruled that the mother could inspect the file in her capacity as the child's parent. However, it held that the mother's attorney was her attorney "in the context of the adoption case, not the dependency case," and "[i]t would not be appropriate to grant [counsel] access to the dependency file because [counsel] did not act as [the mother's] attorney in the dependency case."

Section 39.0132(3), Florida Statutes, is the operative statute, but nothing in the statute limits which attorney of the parent has access to the dependency file. Moreover, it is conceivable that once the mother was given access to the dependency file, she would simply turn the information over to her present counsel. Appellee defends the court's decision on the basis of the language in section 39.0132(3) subjecting the right to access the records to "the provisions of section 63.162 . . . ." Section 63.162(2), Florida Statutes, states in pertinent part:

> In the case of an adoption not handled by the department or a child-placing agency licensed by the department, the department must be given notice of hearing and be permitted to present to the court a report on the

---

[*] However, as to the propriety of the trial court's exclusion of Pam Dudek—a classification-sentence specialist at Appellee's prison—we hold that the issue was not preserved for our review. Appellants did not proffer or attempt to proffer her testimony. Instead, they afforded the trial court only a snapshot of what she might have said. "We cannot consider the admissibility of excluded testimony which is not present in the record." *Savell v. State*, No. 1D19-0136, 2019 WL 3783381, *1 (Fla. 1st DCA Aug. 13, 2019); *see also Cardenas v. State*, 816 So. 2d 724, 725 (Fla. 1st DCA 2002) (holding "[a] proffer of excluded testimony is necessary to preserve a claim that the testimony was erroneously excluded," (citing *Lucas v. State*, 568 So. 2d 18, 22 (Fla. 1990))).

advisability of disclosing or not disclosing *information pertaining to the adoption.*

(Emphasis added.) As Appellants point out, they were not seeking information pertaining to an adoption, but information from the recent dependency proceedings relevant to proving grounds for the termination of Appellee's parental rights. Consequently, we hold that the trial court erred in denying the Appellants' motion for counsel to obtain the records.

## III.

In conclusion, the trial court's misinterpretation of the provisions of section 63.089(4) and its erroneous evidentiary rulings warrant reversal and remand for a new hearing.

REVERSED and REMANDED for further proceedings consistent with this opinion.

WOLF and ROBERTS, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

William S. Graessle and Jonathan W. Graessle of William S. Graessle, P.A., Jacksonville, and Carol A. Caldwell, St. Augustine, for Appellants.

David Maldonado of The Maldonado Law Firm, P.A., Lakeland, for Appellee.